(No. 31268.

VELSICOL CORPORATION, Appellant, *vs.* JULIUS HYMAN, Appellee.

*Opinion filed January 18, 1950—Rehearing denied March 20, 1950.*

Poppenhusen, Johnston, Thompson & Raymond, Follansbee, Shorey & Schupp, and Schroeder & Simpson, (Floyd E. Thompson, Clyde E. Shorey, and Werner W. Schroeder, of counsel,) all of Chicago, for appellant.

Hopkins, Sutter, Halls, DeWolfe & Owen, Bell, Boyd, Marshall & Lloyd, Wilkinson, Huxley, Byron & Hume, (Albert L. Hopkins, Thomas L. Marshall, Charles L. Byron, Donald J. DeWolfe, and William G. Blood, of counsel,) all of Chicago, for appellee.

Mr. Justice Simpson delivered the opinion of the court:

The Appellate Court reversed a decree of the superior court of Cook County in favor of appellant, Velsicol Corporation, and against appellee, Julius Hyman. Leave to appeal was granted.

The suit involves four applications for patents pending in the United States Patent Office and all applications for letters patent filed in foreign countries corresponding to said four applications and all patents which may issue thereon. It seeks a decree requiring appellee to assign the applications to appellant, and for an injunction restraining appellee from using or from disclosing the processes, formulas, methods and products covered by said applications to anyone other than appellant, and from using or revealing any other processes, formulas, methods or products discovered by or disclosed to appellee while in the employ

of appellant. The pleadings are sufficient to cover all the issues presented and no question on them has arisen.

The complaint was filed October 15, 1946. The cause was referred to a master who filed his report January 23, 1948, recommending a decree as prayed. Objections and exceptions to the report were overruled and a decree entered May 27, 1948, approving the report and ordering that appellee forthwith assign and transfer to appellant the four applications in question designated, respectively, as serial No. 607078, filed by appellee July 25, 1945, serial No. 643759, filed by him January 26, 1946, and serial Nos. 648204 and 648205, filed by him February 16, 1946. It also orders that he assign and transfer to appellant all applications for letters patent filed in foreign countries corresponding to the aforesaid applications for United States letters patent, and all patents which have issued or which may issue on any of said applications; that upon proper assignments being executed and delivered appellant must pay appellee moneys actually and necessarily disbursed by him for filing fees and legal fees relating directly to the filing of said applications.

The decree enjoins appellee, his assigns, attorneys and agents from using the processes, formulas and products covered by said applications and from disclosing said processes, formulas and products to anyone other than appellant and from assigning said applications to, or permitting the use of said processes, formulas or products by, anyone other than appellant, and from using or revealing any processes, formulas or products and methods and technique of manufacture discovered by, or made known to, appellee while he was in the employ of appellant or which he has learned from any other person now or formerly in the employ of appellant.

The decree was reversed by the Appellate Court because two of the judges considered it against the manifest weight of the evidence. (338 Ill. App. 52.) The other member

of that court took a different view and filed a dissenting opinion. The record is voluminous and contains a large number of exhibits with much oral testimony. There are sharp conflicts on material points and yet many of the facts are not controverted.

Appellee holds a B.S. degree from the University of Chicago and a degree of Doctor of Philosophy from the University of Leipzig, having finished his work in the latter school during August, 1924. He is especially well qualified in chemistry. After finishing school he was variously employed, but from May, 1928, to October, 1930, he served as a research chemist for the Pure Oil Company.

Appellee had an inventive turn of mind and by November, 1930, had gained some ideas which he thought were patentable. Not having the necessary capital to provide a research laboratory in which his ideas could be furthered, exploited and expanded, he sought financial assistance through certain of his cousins. The first one he approached, Henry Degginger, could not assist him in a financial way. He then called upon his cousin Joseph Regenstein, and, after explaining his ideas, which were then embodied in two certain applications for patents having to do with polymers, a waste product derived from the refining of petroleum, it was decided that a research laboratory would be essential, and through Regenstein a corporation was formed January 16, 1931, which established and owned such laboratory. The capital of this corporation in the beginning was small, being $20,000, $8000 of which was furnished by Transo Envelope Company of which Joseph Regenstein was president and principal stockholder, F. P. Schneider being the next largest stockholder therein; $8,000 by Arvey Corporation of which said Regenstein was also president and chief stockholder. The other $4000 was furnished by appellee after that sum had been paid to him by the new corporation for an assignment or sale to it of his two applications for patent as aforesaid.

While the capital of the corporation was small, the money expended by it in connection with research matters, the hiring of expert chemists, the purchase of materials, etc., ran into large sums. The money was furnished by the Transo and Arvey companies through the influence of Joseph Regenstein. The first corporate name was Varnoil Corporation, which about a year later was changed to Velsicol Corporation. At the time appellee severed his connection with Velsicol in 1946, and for a number of years prior thereto, that company was indebted to Transo Envelope Company and Arvey Corporation in the aggregate sum of $528,000 for money advanced and used in connection with the research laboratory and in the production of some of the products manufactured under protection of patents issued upon inventions worked out in the laboratory. Appellee was employed by Varnoil-Velsicol, but part of his work was to improve the product of the Transo Envelope Company.

January 31, 1931, appellee signed an agreement with Transo Envelope Company referred to in the record as plaintiff's exhibit 91, reading as follows:

"This Agreement, Made and entered into between the undersigned and Transo Envelope Company, a Delaware corporation, hereinafter called the "Company"; Witnesseth That:

Whereas, the undersigned has been or is about to be employed by Varnoil Corporation and as a part of his employment will be engaged in discovering, developing and inventing processes, formulas and methods relating to window envelopes manufactured by the Company and relating to the manufacture and production of such window envelopes and in connection with his employment there will from time to time be imparted and disclosed to the undersigned secret processes and formulas used in connection with such window envelopes.

Now, Therefore, in consideration of said employment and of the salary from time to time paid to the undersigned, the undersigned hereby agrees as follows:

1. That any and all inventions, improvements, discoveries, formulas or processes relating to window envelopes or relating to the manufacture thereof, invented, discovered or learned by the

undersigned during the term of his said employment will at once be fully disclosed by the undersigned to the President of the Company and will be the sole and absolute property of the Company and the Company will be the sole and absolute owner of all patent and other rights in connection therewith and the undersigned at all times, both during his employment and after the termination of his employment, will keep all of the same secret from everyone except the Company and will disclose the same to no one except the President of the Company unless the undersigned is otherwise authorized by writing signed by the President of the Company.

2. The undersigned hereby agrees that at all times, both during his employment and after the termination of his employment he will keep secret all processes, inventions and formulas made known to him by the Company or Varnoil Corporation, or any of the officers or employes of the Company or Varnoil Corporation, or learned by him while so employed, and that he will not disclose or make known any of the same or anything relating to the same to any person, firm or corporation except when authorized so to do by writing signed by the President of the Company.

3. This agreement shall be binding upon the undersigned, his heirs, executors, administrators and assigns and shall inure to the benefit of the Company, its successors and assigns."

When asked about signing this exhibit 91 appellee did not remember it and was under the impression he had not signed it. Upon its production and examination, however, he admitted that he had executed it.

It is claimed by appellant, but denied by appellee, that at the same time appellee signed the agreement with Transo · he also signed one with Varnoil having the same wording as plaintiff's exhibit 4, which was signed by another employee of Varnoil and which reads as follows:

"Whereas, the undersigned has been or is about to be employed by the Company and as a part of his employment will be engaged on behalf of the Company in discovering, developing and inventing processes, formulas and methods relating to oils, paints, varnishes and the ingredients and products thereof, and relating to the manufacture and production of oils, paints, varnishes and the ingredients and products thereof and in connection with his employment there will from time to time be imparted and disclosed to the undersigned secret·processes and formulas used by the Company in connection with its business;

358

Now, THEREFORE, in consideration of said employment and of the salary from time to time paid to the undersigned, the undersigned hereby agrees as follows:

1. That any and all inventions, improvements, discoveries, formulas or processes relating to oils, paints, varnishes or any of the ingredients or products thereof or relating to the manufacture or production of oils, paints, varnishes or any of the ingredients or products thereof, invented, discovered or learned by the undersigned during the term of his employment by the Company will at once be fully disclosed by the undersigned to the President of the Company and will be the sole and absolute property of the Company and the Company will be the sole and absolute owner of all patent and other rights in connection therewith and the undersigned at all times, both during his employment and after the termination of his employment, will keep all of the same secret from everyone except the Company and will disclose the same to no one except the President of the Company unless the undersigned is otherwise authorized by writing signed by the President of the Company.

2. The undersigned hereby agrees that at all times, both during his employment and after the termination of his employment he will keep secret all processes, inventions and formulas made known to him by the Company or any of its officers or employes or learned by him while in the employ of the Company and that he will not disclose or make known any of the same or anything relating to the same to any person, firm or corporation except when authorized so to do by writing signed by the President of the Company.

3. This agreement shall be binding upon the undersigned, his heirs, executors, administrators and assigns and shall inure to the benefit of the Company, its successors and assigns."

The record indicates that it was customary for employees working in laboratories where discoveries were undertaken and made, inventions originated and patents applied for to agree to assign to the employer all applications for patents and patent rights and agree not to divulge any of the information gained in such laboratories to anyone but the employer. Appellee had signed such agreement with the Pure Oil Company and with Transo when employed by them, respectively, and, as vice-president and directing head, required all other employees of Varnoil-Velsicol to enter into like agreements and to evidence the

agreements in writing. Several hundred of these agreements were executed in favor of the company. The form was changed from time to time. After insecticides had been discovered some of the agreements signed by employees expressly referred to insecticides while others did not, but either form was used.

In one count of the complaint appellant relies upon the express agreement signed by appellee. In the other count it relies upon the facts and the relationship of the parties aside from any express agreement as constituting its right to the relief sought. Appellee denies that he entered into any express agreement as charged and also denies that the relations of the parties were sufficient in law to require him to perform in the manner sought by this suit.

Appellee argues with much force that all he intended to turn over to the appellant were the two original applications for patent having to do with polymers. He denies having signed an agreement such as exhibit 4, above, but claims that when requested to sign it he refused to do so for the reason that his share of the corporate stock was too small to call for his entering into such an arrangement. His testimony in this connection was corroborated by his cousin, Henry Degginger, although the latter testified that he did not know what appellee might have signed the following day.

The record shows that appellee and Miss Harriet Sims, a bookkeeper for the appellant, had' charge of the files in which all agreements similar to exhibit 4 executed by employees were kept and that Joseph Regenstein had access to them. Miss Sims married appellee June 17, 1944, and, as his wife, testified that there was no such agreement in the files executed by appellee. Appellee also contends that the objects for which Varnoil-Velsicol was organized indicate no thought that the corporation would deal in anything other than the objects of his two original applications for United States patents.

As against the evidence and contentions of appellee, the record shows that in one of the early discussions before the corporation was formed, F. P. Schneider, an officer and stockholder of Transo Envelope, stated to appellee that the company would have to be adequately protected in the same manner as Transo was protected by having agreements signed by all employees, such as the attorney drew up for Transo when it first employed appellee about 1925 or 1926. Joseph Regenstein, the president, and F. P. Schneider, the secretary of appellant, both testified that they saw the agreement, the same as exhibit 4, bearing appellee's signature in the company's files, but could not find it later.

The record is clear that each and every application for patents and patent rights upon inventions made by appellee in appellant's laboratory were assigned by him to appellant except the four in question. Appellee explains this situation by saying that he could assign them or not, according to his own notion, and that the reason for his assigning the number he did was to help the company during the period in which help was needed. At least five of those assigned had to do with insecticides, ideas and inventions which appellee contends were not thought of, nor included within, the original undertaking.

Among the objects for which the company was formed we find the following:

"To manufacture, produce, invent, export, import, develop, use, buy, sell and generally deal in and with, at wholesale and/or retail, as principal, agent, broker, and/or jobber, oils, paints, pigments, varnishes, dyes, coloring matter, acids, solvents and chemicals of all kinds."

Also the following:

"To apply for, secure, obtain, register, purchase, create, lease or otherwise acquire and to hold, use, own, operate and introduce, and to sell, assign, lease on royalty or otherwise dispose of, any letters patent, patent rights, patent applications, licenses or grants

in respect to letters patent or patent applications, inventions, improvements, processes, formulas, trade-marks and trade names, copyrights, labels and designs, issued by, used in connection with or secured under, letters patent of the United States, or any foreign country, or otherwise, and to use, exercise, develop, grant licenses and territorial rights in respect of, sell, or otherwise turn to account any such patents, applications, licenses, processes, formulas and inventions or the like, or any such trade-marks, trade names, copyrights, labels, designs, property or rights, including the good will of any thereof, and to supervise or otherwise exercise such control over its said licensees and the business conducted by them, as may be agreed upon in its contracts with such licensees for the protection of its rights in said patents or other property and rights, and to secure to it the payment of agreed royalties or other considerations; and to manufacture, buy, sell, or deal in any article produced as the result or through the use of, any such inventions, processes, or the like or under any such patent, or any articles of any description used, or suitable to be used in connection therewith."

As late as February, 1944, appellee filed an employer's application to the Salary Stabilization Unit in which, referring to Velsicol Corporation, among other things, he said:

"It was founded in January, 1931, to exploit the patents and processes invented and perfected by Dr. Julius Hyman. From the date of its organization until some time in 1935, its activities were exclusively devoted to experimentation and research in which, necessarily, it employed relatively few people. As the results of its efforts became manifest, the commercial possibilities of its unique products were opened thereby involving a considerable expansion both of plant facilities as well as personnel."

In this application he further said:

"By August, 1943, the research activities of Velsicol Corporation had expanded so that Dr. Hyman, in addition to being Director of Research, and also General Manager of the corporation, required the services of a competent individual whose exclusive task it would be to supervise all research activities, under the general direction of Dr. Hyman."

He further said in this application wherein it referred to research chemists of appellant:

"Their duties, as their title implies, consist of the research and development of new products as well as new uses for the company's present products. The procedure of the company is to assign a chemist to a particular project, and from that point on, it is up to the individual chemist to use his own particular ingenuity and skill. Since the results achieved vary, the management must reward these employes in accordance with what they have accomplished during the year. In this connection, it should be noted that all patents and discoveries of these employees become the property of Velsicol Corporation and the only financial reward for valuable discoveries is the salary and bonus paid to these individuals."

We believe the four applications in question refer to and cover inventions or processes clearly within the objects for which appellant was organized. Their value is estimated to be between four and five million dollars.

Simon H. Herzfeld, a chemist employed in appellant's laboratories, was assigned a project by appellee in August, 1944, which resulted in the discovery covered by patent application No. 581172. His assignment was to prepare hexachloro cyclopentadiene according to a brief description of the preparation prepared by the appellant's librarian. Dr. Herzfeld referred to the Chemical Abstracts having the original article in greater detail than the brief mentioned in the librarian's report which gave only one of the reactants, namely, sodium hypochlorite. He used the higher concentration of hypochlorite and used his own judgment in other respects. As a result the discovery of a suitable insecticide was made which became known as 237. The main insecticide covered by the four applications in question is known as 1068, which, according to Dr. Herzfeld, is an offshoot of 237 and is the immediate substance that is treated under a chemical process and that single treatment results in 1068. He said: "There would not have been any '1068' at the time it was discovered without '237'."

We believe the record fairly establishes that a number of chemists employed by appellant, including appellee, had part in discovering or inventing the component parts of

1068 and other insecticides through laboratory tests and experiments conducted by appellant, and that 1068 cannot be said to result exclusively through the brain of appellee.

In the beginning, appellee was paid a salary of $40 a week by appellant, which increased from time to time. It was increased to $100 per week, then to $125, then to $300, then to $350 until 1945, when it was increased to $600 per week. Thirty-eight applications for patents had been assigned to appellant by appellee during the twelve-year period from the beginning to 1943, and he appeared as the inventor in thirty-seven of them.

In the early fall of 1943 appellee complained to Joseph Regenstein about his interest in the company together with the compensation he was receiving and told Regenstein that from then on he did not feel that he would want to assign further patent applications to the company without some return compensation by the company, and that he did not feel that his salary was other than for his services as the operating head of the company. He was then making $350 a week. In referring to that conversation Regenstein said: "I do recall that Dr. Hyman [appellee] talked to me about greater participation in the business and in that conversation stated that there were some patents that he was not going to assign, and I told him very plainly that that was not in accordance with our agreement and that refusing to assign patents had no connection at all with any greater participation in the company and I did not want those two things connected."

After that conversation appellee continued to assign his applications for patents as before, including some which covered insecticides and spent approximately $150,000 of appellant's money in research and experiments which resulted in applications being made for patents covering a number of inventions. His salary was increased in 1945 to $600 per week, or $31,200 per year, but the matter of his participation in the company was never settled to ap-

pellee's satisfaction, although he testified that Regenstein said he would be taken care of.

About the middle of May, 1946, appellee, with president Joseph Regenstein, conferred with agents of the Sun Chemical Company of New York. Later they went to New York for further conference but the negotiations did not result in a sale. Appellee did most of the talking at the New York conference, stating that the Velsicol Corporation business was very good and reviewed the various products the company was making. In testifying with reference to the New York conference, appellee said in substance: "I emphasized the value of 1068 as one of the elements to be considered in whether Sun Chemical should purchase Velsicol. I may have said that 1068 was worth in itself more than we were going to ask for the corporation." At another time he said, "When I was executive vice-president of Velsicol I had the figure 1068 registered as a trade-mark in conjunction with the name Velsicol."

Appellee's refusal to assign the four applications in question and his dissatisfaction relative to his interest in the company and the salary he was receiving created tension between him and appellant. He threatened to resign a number of times and was finally told by Regenstein that if he did his resignation would be accepted. He thereupon resigned in September, 1946, and has ever since retained and refused to assign the applications. Soon after his resignation he formed a new company known as Julius Hyman & Company and began business in Denver, Colorado, making use of the inventions, formulas and insecticides discovered and invented during his employment with appellant. His cousin and witness, Henry Degginger, with his three sons are all employed by the new company as well as many other former employees of Velsicol.

A study of the acts and statements of appellee as shown by the record strongly indicates he knew and considered that all applications for patents and all results from research

and experiments growing out of his work and employment in appellant's laboratory were the property of appellant. The fact that appellee made voluntary and unconditional assignments to appellant of a large number of patent applications covering his inventions during the period of his employment is substantial proof that he considered himself bound so to do under his agreement, and that he considered his inventions the property of appellant. *Estate of Ramsey* v. *Whitbeck,* 183 Ill. 550, 559-564; *Magnetic Mfg. Co.* v. *Dings Magnetic Separator Co.* 16 F. 2d, 739.

Agreements to assign the inventor's interest in his inventions to his employer have been upheld where the employment was for research and experimental work. *Tennessee Copper & Chemical Corp.* v. *Martin,* 4 F. Supp. 38, affirmed 66 Fed. 2d, 187.

To substantiate his position that his original undertaking did not extend to insecticides and that the inventions in question belong to him, appellee cites and relies upon *Joliet Mfg. Co.* v. *Dice,* 105 Ill. 649. In that case the contract clearly was limited to improvements on shellers and powers and did not cover check rowers. The employment of appellee covered broadly all work in connection with research and experiments having to do with chemicals of all kinds. The facts here are much different from those in the *Dice* case.

Another case on which appellee places great reliance is *United States v. Dubilier Condenser Corp.* 289 U.S. 178. There the employees were working for the Bureau of Standards, a subdivision of the Department of Commerce, and were employed in the radio section and engaged in research and testing in the laboratory. Their invention had to do with the problem of applying alternating current to broadcast receiving sets. It was independent of their work and voluntarily assumed. No instructions were received from, and no conversations relative to the invention were held by, these employes with the head of the radio

section or with any superior. They were permitted by their chief, after the discoveries had been brought to his attention, to pursue their work in the laboratory and to perfect the devices embodying their inventions. No one advised them prior to the filing of applications for patents that they would be expected to assign the patents to the United States. It was there held that the patents belonged to them and not to the United States, but the facts there are much different from those in the case before us.

Where the master has heard the evidence and makes findings of fact which are approved or adopted by the chancellor, they will not be disturbed on review unless manifestly against the weight of the evidence. *Carter* v. *Michel,* 403 Ill. 610; *Kane* v. *Johnson,* 397 Ill. 112; *Chambers* v. *Appel,* 392 Ill. 294.

As we view the record, it was not the intention of the parties that appellant expend large sums of money for laboratory facilities and equipment so that appellee might experiment to the end of discovering patentable objects or ideas which would be his. It is our opinion that appellant was organized for the purpose of experimenting with chemicals, discovering and inventing chemical and other processes, formulas and the like so that patents could be obtained thereon and sold or licenses issued thereon, or products be manufactured under the protection of such patents, and that appellee was employed by it in furtherance of those objects. The risk was that of appellant and had the appellee and the other chemists employed by it failed to make valuable discoveries it stood to lose large sums of money while they were paid for their time and service.

In our opinion, appellant has proved by the greater weight of the evidence that a written agreement was signed by appellee requiring him to make assignments to it and to keep secret all information received by him, as alleged in the complaint; and it has shown clearly and satisfactorily the terms and provisions of that agreement. That

being our holding, it is not necessary that we determine whether the facts were sufficient to prove an implied contract to do the things covered by the agreement. In our study of the record, however, we have gained impressions and formed opinions upon all the issues, and we might add that had we not found an express agreement to exist we would in all probability have found the evidence sufficient to constitute an implied contract to do the things covered by the agreement.

We have considered all points raised, but to discuss them all would unduly lengthen this opinion and could serve no useful purpose. The decree of the superior court meets with our approval while the judgment of the Appellate Court does not. The judgment of the Appellate Court is therefore reversed and the decree of the superior court is affirmed.

*Appellate Court reversed; superior court affirmed.*