Julius HYMAN, Appellant,

v.

Joseph REGENSTEIN (Continental Illinois National Bank & Trust Company of Chicago, Helen A. Regenstein, Betty R. Hartman and Joseph Regenstein, Jr., Co-Executors, substituted in place of Joseph Regenstein, deceased), Appellees.

No. 16816.

United States Court of Appeals Fifth Circuit.

July 23, 1958.

Rehearing Denied Nov. 21, 1958.

**504**

William G. Blood, Chicago, Ill., Hopkins, Sutter, Owen, Mulroy & Wentz, Chicago, Ill., of counsel, for appellant.

Floyd E. Thompson, Chicago, Ill., Thompson, Raymond, Mayer, Jenner & Bloomstein, Chicago, Ill., Walter Humkey, Miami, Fla., Fowler, White, Gillen, Yancey & Humkey, Miami, Fla., for appellees.

Before JONES, BROWN, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This is an appeal from a judgment of the District Court for the Southern District of Florida dismissing Julius Hyman's suit against Joseph Regenstein. Suit was filed in the Circuit Court of Palm Beach County, Florida, and removed on the ground of diversity of citizenship. The matter in controversy is said to involve some $20,000,000.

The complaint alleges that Regenstein was in a fiduciary relationship with Hyman that he violated by acts of fraud, deceit, and overreaching. The prayer asks for imposition of a constructive trust, an accounting, and damages.

### I.

The case is singular. Hyman's theory of the case would allow him to snatch victory from five defeats in the courts. In each of these decisions the court held against Hyman on all of his contentions. Now reiterating in one suit the contentions he had spread over four answers and a complaint, Hyman argues that what the five courts did was to give effect to Regenstein's bad faith. Thus, instead of the adverse adjudications being a bar to Hyman's suit, they are a necessary ingredient of his cause of action. He claims immunity from res judicata, because he sued Regenstein (not Velsicol Corporation) and the cause of action and relief sought are not the same as in the prior litigation.

Most of the issues on which Hyman's cause of action depends have been fought over one or more times and decided against Hyman. Under the doctrine of collateral estoppel by judgment he is not entitled to relitigate these issues.

There are other questions. Hyman contends that he and Regenstein were engaged in a joint venture, and he contends that Regenstein was in position of trust. Each contention is said to establish a fiduciary relationship Regenstein is alleged to have violated. These questions, too, we decide in favor of appellees.

### II.

Focal point in the long dispute between the parties is the ownership of chlordane, a commercially successful insecticide. Hyman, while working for Velsicol Corporation, invented chlordane.

Regenstein was president of Velsicol and its effective majority stockholder. He died while this case was pending on appeal.

Julius Hyman, born in 1901, and Joseph Regenstein, born in 1889, were first cousins. Regenstein's father, and later Regenstein himself, helped finance Hyman's education. Hyman acquired degrees in chemistry from the University of Chicago and the University of Leipzig, and later was employed by Pure Oil Company as a research chemist on the company's petroleum cracking process. In 1930, Hyman filed two patent applications covering a process for the use of petroleum polymers in formulations with vegetable fast-drying oils, producing a synthetic oil having many of the characteristics of linseed oil. In November, 1930, he approached a cousin, Henry Degginger, to discuss means for financing the inventions. Degginger was the second largest stockholder and an officer of Arvey Corporation in Chicago. Regenstein was the largest stockholder in Arvey and in another company, Transo Envelope Corporation. Hyman met with Degginger and Regenstein and convinced them that his inventions had commercial possibilities. Shortly thereafter Hyman discussed the matter with Perry Schneider, the second largest stockholder and an officer of Transo. Regenstein, Schneider, Degginger and Hyman agreed in December, 1930, to organize a corporation, the stockholders to be Hyman and the two corporations that might benefit from the inventions, Arvey and Transo.

Early in January, 1931, Varnoil Corporation was organized under the laws of Illinois to engage in business in the field of chemistry. 200 shares of stock having a par value of $100. a share were issued, 40 shares to Hyman and 80 each to Arvey and Franso. Varnoil purchased Hyman's two inventions for $4,000. With this money Hyman purchased his stock in Varnoil. Later, the name of the corporation was changed to Velsicol. The Board of Directors was composed of Hyman, Regenstein, Schneider, Degginger, and Sidney Blum, (another stockholder, director, and officer of Arvey). Regenstein was elected president, Hyman vice-president, and Schneider secretary-treasurer. Hyman was employed as general manager and was paid a salary by the corporation.

The record shows that it was the established policy of Velsicol, as a condition of employment, that every employee sign a secrecy agreement with the corporation. The agreement provided that all inventions made during the course of employment were the property of the corporation. It obligated the employee to keep secret for the exclusive benefit of the corporation discoveries made by the employee or disclosed to him. Regenstein contends that all employees, including Hyman, signed these agreements. He introduced into evidence agreements signed by all employees, except Hyman. Secrecy agreements were signed between Transo and all the Velsicol employees, including Hyman, because Velsicol was doing research work for Transo. Hyman was familiar with Velsicol's policy concerning these secrecy agreements. As general manager he required all employees, without exception, to sign these agreements. Hyman calls this contract a *"Phantom Agreement"*. He denies that he ever signed such an agreement, although for approximately fifteen years after the formation of the corporation, without raising a question, he assigned some forty inventions to the corporation. In each instance he assigned his patent application to Velsicol simultaneously with the signing of the applications. These assignments were recorded in the Patent Office, and the registered document was returned to Hyman as the operating head of Velsicol to be retained as property of the corporation. At no time prior to 1943 did Hyman question his obligation to assign the inventions nor did he ever suggest that his assignments were voluntary contributions by him to the company.

Some time around October 1, 1943, two years before Hyman's first refusal to assign an invention, he was at a party at Regenstein's home. He told Regen-

stein that he did not feel that he should continue to assign his inventions to the corporation unless he received greater participation in the fruits of the inventions. Hyman was then receiving a salary of $18,200 a year and he had a 20 per cent interest in Velsicol. Regenstein testified that this was the first time Hyman had complained about making the assignments. Velsicol then owed half a million dollars to Arvey and Transo for sums advanced for research and development. Reminding Hyman of his agreement, Regenstein said: "If that's the way you feel we may as well call the whole thing quits." Hyman said that he did not want that result. Regenstein suggested that he continue to make assignments to Velsicol and that the matter of increased compensation or a larger interest would be worked out "at the proper time." This, Hyman says, was "the *False Promise*". No plan was ever agreed upon or even discussed. Hyman continued to assign his inventions. Shortly after this conversation, to which Hyman attaches great importance, Velsicol attempted to raise his salary to $30,-000 but was not permitted to do so, because of war-time salary stabilization regulations. In 1945, as soon as salary restrictions were removed, Hyman's salary was increased from $18,200 a year to $31,200 a year. There was no further discussion of assignment of patent applications until the summer of 1946 when Regenstein discovered that Hyman had not assigned to the corporations patent applications covering chlordane, an insecticide developed in Velsicol's laboratory at costs in excess of $100,000.

On March 2, 1945 three of the corporation's research chemists, Herzfeld, Lidov, and Bluestone, filed a patent application as joint inventors on new and apparently valuable insecticides. This patent was assigned to the corporation, and the recorded assignment was returned as usual to Hyman for safekeeping. On July 25, 1945 Hyman filed an application for a patent on an invention based on chlorination of the adducts which were disclosed in the Herzfeld-Lidov-Bluestone application. He withheld the assignment of this application. This was Hyman's first refusal to assign an invention to Velsicol in approximately fifteen years, although in 1943, just prior to the so-called "false promise" conversation at Regenstein's party, Hyman had balked at assigning another patent application that he later assigned. On January 5, 1946 the three chemists who invented the first insecticides filed a second application making enlarged claims. The application was assigned to the corporation. Three weeks later Hyman filed a second patent application relating to the halogenated derivatives of the adducts disclosed in the second tri-party patent. He withheld the assignment of this application. These two applications covered chlordane.

Early in June, 1946, Regenstein asked Hyman to assign the two patent applications for chlordane to Velsicol. Hyman refused, unless he were given a controlling interest in Velsicol. Regenstein took the position that Hyman was bound by contract to make the assignment and that until Hyman did he would not discuss the subject of greater participation. Finally, on September 13, 1946, Regenstein accepted Hyman's resignation as general manager. On September 18, at a board meeting of all the directors, including Hyman and Regenstein, Hyman's resignation as vice-president was accepted, and on October 17 he resigned as a director. Hyman went to Denver, Colorado, raised capital, organized Julius Hyman & Company, persuaded some of his former associates at Velsicol to join him, and commenced the production of chlordane.

A series of lawsuits followed. On October 15, 1946, Velsicol, asserting ownership of chlordane, brought suit in the Superior Court of Cook County, Illinois to compel Hyman to assign the chlordane patents, and to restrain Hyman from using or disclosing to others the secrets of these patents. The crucial issue in this suit was whether Hyman had signed the secrecy agreement binding him to assign the patents to his in-

ventions to Velsicol. The Supreme Court of Illinois held that the agreement was no phantom. "A written agreement was signed by [Hyman] requiring him to make assignments * * * and * * * had we not found an express agreement to exist we would in all probability have found the evidence sufficient to constitute an implied contract." As to Hyman's persistent denial, the Court said that "he knew and considered that all applications for patents and all results from research and experiments growing out of his work and employment in [Velsicol's] laboratory were the property of [Velsicol]. * * * As we view the record, it was not the intention of the parties that [Velsicol] spend large sums of money for laboratory facilities and equipment so that [Hyman] might experiment to the end of discovering patentable objects or ideas which would be his". Velsicol Corp. v. Hyman, 1950, 405 Ill. 352, 90 N.E.2d 717, 724, certiorari denied 1950, 339 U.S. 966, 70 S.Ct. 1002, 94 L.Ed. 1374.

In December, 1946, Velsicol was recapitalized. In the recapitalization, Hyman's 20 per cent interest in Velsicol decreased to 0.7 per cent because of his lack of sufficient capital to protect his pro rata interest in the corporation. Regenstein stated that the main purpose of this recapitalization was to pay off a debt of $528,000 Velsicol owed to Transo and Arvey Corporations. Hyman characterizes the recapitalization as a "Freeze-out" of his interest, and on this appeal portrays it as one element of Regenstein's fraudulent conduct. On December 27, 1946 Hyman brought a stockholder derivative action in Illinois against Velsicol, Regenstein and others challenging the validity of the recapitalization, asserting that he continued to own 20 per cent of the Velsicol stock, and alleging that the recapitalization was fraudulent. The Illinois Appellate Court held that "[Hyman's] testimony shows clearly that the plan [of reorganization] was legal and not unfair"; that Regenstein committed no wrong as director or otherwise and was under no obligation to account to Hyman or the corporation. The Court determined that Hyman did not own a 20 per cent interest in the business—as he claimed then and now. Hyman v. Velsicol Corp., 1951, 342 Ill.App. 489, 97 N.E.2d 122, 124. In December 1952 Velsicol was merged with Arvey. In 1955 the companies were divorced, in the course of which Hyman's interest in Velsicol was reduced from 0.7 per cent to 0.3 per cent.

On April 11, 1947 Velsicol brought suit against Julius Hyman & Co. in the District Court in and for the County and City of Denver, Colorado to enjoin Hyman from manufacturing and selling chlordane and from disclosing to others the chlordane formula, for an accounting of profits, and for damages caused by unfair competition. In a fifty-two page opinion thoroughly reviewing the facts the Colorado Supreme Court held: "There is positive evidence that in January, 1931, [Hyman] also signed the first form of employment [secrecy] agreement. * * * [Hyman and the other defendants] now seek to appropriate [Velsicol] trade secrets to their own use and profit by a violation of their contractual agreements and a betrayal of the confidence reposed in them by plaintiff. This they may not do; such conduct is abhorrent to our conception of ordinary honesty. * * * Hyman was under a contractual obligation to assign to plaintiff all inventions." Julius Hyman & Co. v. Velsicol Corp., 1951, 123 Colo. 563, 233 P.2d 977, 983, certiorari denied 1951, 342 U.S. 870, 895, 72 S.Ct. 196, 96 L.Ed. 671.

In 1949, after Hyman and Julius Hyman & Company were enjoined from producing and marketing chlordane, the company began marketing "aldrin" and "dieldrin", other insecticides discovered by Hyman and his associates while employed at Velsicol. Velsicol filed a second injunction suit in the District Court in Denver, Colorado, claiming title to the insecticides. Hyman and the other defendants set up the defense that Hyman and Regenstein had entered into a joint venture. In addition, Hyman made this

defense the basis of a counterclaim in his individual capacity. Later, he dismissed his counterclaim and no decree was entered as to it. The chancellor found for Velsicol. Six weeks later Julius Hyman & Co. sold out their interests to Shell Chemical Corporation. Hyman received about $1,000,000 for his stock. Shell did not appeal the chancellor's decision.

November 1, 1950, Velsicol sued Hyman in the United States District Court in Colorado. Velsicol alleged that Hyman had filed applications for patents that interfered with applications assigned to and owned by Velsicol, and that he had refused to assign applications covering certain products. The court granted Velsicol's motion for a summary judgment. "The relationship of the parties during the employment of Julius Hyman by Velsicol Corporation and the duties and obligations which Hyman bore to the latter have been finally adjudicated on two prior occasions. [Citing the Illinois and Colorado cases.] These cases leave no doubt that all of the discoveries, inventions and processes which were developed or invented by Julius Hyman while in the employment of the plaintiff and any applications for letters patent which may have been filed thereon are the property of Velsicol Corporation. * * * The facts which [Hyman] has pleaded as constituting 'unclean hands' * * * are fully set forth [in the recapitalization suit in which Hyman] sought to enjoin Velsicol Corporation from taking and continuing the very actions which he now pleads in defense under the unclean hands doctrine. The Illinois Appellate Court found that the equities were with Velsicol Corporation". Velsicol Corp. v. Hyman, D.C.Colo.1952, 103 F.Supp. 363, 366.

Hyman insists that those cases were different; now, at last he has come to grips with his flesh and blood antagonist. It is Julius Hyman against Joseph Regenstein.

Hyman's complaint starts with a comparison of the "man with the brains, a chemist with a Ph.D. * * * 29 years of age and inexperienced" and "the man with the money * * * over 40 years old [Regenstein was 41] and a mature, experienced businessman and financier". Again Hyman denies that there was a "formal agreement * * * to assign patents covering his inventions" (the Phantom Agreement). Again Hyman says that Regenstein, "alter ego" of Arvey and Transo, "taking advantage of [the corporate fiction and] his technical power as majority owner of Velsicol falsely and with fraudulent intent designing to defeat the rights of and equities of plaintiff as a co-venturer and co-partner by seeking to derogate plaintiff to the status of a mere employee of an independent corporation, caused Velsicol" to sue for the assignment of the chlordane patent applications. This is the Corporate Cudgel. He alleges that Regenstein "falsely and fraudulently testified and induced another witness to testify that plaintiff signed a written agreement upon the formation to keep secret and to assign it all inventions". He alleges that the Illinois court "would not have held as it did but for the false and fraudulent representations and testimony given and induced by defendant". Again Hyman complains of the Freeze-Out and the False Promise.

Seeing nothing new in all this, Regenstein moved for a summary judgment. After the parties submitted depositions, and some testimony was taken (the record runs 1500 printed pages), the district court granted a summary judgment on the grounds of res judicata, limitations, laches. This Court affirmed the district court. 1955, 220 F.2d 347. On rehearing, however, we reversed and remanded the case, because we considered that a summary judgment was not an appropriate means of disposing of this litigation. The case was sent back "not for a proceeding de novo, but for the parties to complete the evidence, and for the judge to * * * decide the issues presented". 1955, 222 F.2d 545, 549.

The trial lasted more than three weeks. The district court again rendered judg-

ment for Regenstein. The trial judge found: "Regenstein practiced no fraud or over-reaching upon the plaintiff, but on the other hand he did all that he had personally agreed to do." The able, conscientious trial judge held: "Plaintiff has failed to prove the allegations of his complaint. The relation of joint venturers in the business undertaking here in issue never existed between plaintiff and defendant. Defendant has breached no duty he owes to plaintiff, holds no property belonging to plaintiff, and is under no obligation to account to plaintiff."

### III.

On the first appeal this Court stated that in order for a judgment to be res judicata "there must be a concurrence of four conditions, namely: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of persons and of parties to the action; (4) identity of the quality of the persons for or against whom the claim is made. * * * If one of the five suits is a bar, that ends the case; if none is a bar, all are not more potent". Hyman

v. Regenstein, 1955, 222 F.2d 545, 549. Hyman argues therefore that appellees must come forward with one prior suit which is res judicata here; that is their burden.

▇ This argument overlooks the distinction between res judicata, the inclusive concept, and collateral estoppel by judgment; the distinction between a judgment as a bar to a subsequent cause of action and a judgment "as conclusive evidence of some fact or issue common to different causes of action". 2 Freeman on Judgments, Sec. 671, p. 1417. The question before us now is the effect of prior judgments when a different cause of action is involved and the evidence in the record shows that certain basic issues on which this cause of action depends have been litigated at least once.[1] Under these circumstances, there is no question of the effect of a judgment as a merger of the original cause of action in the judgment or of its being a bar to a later suit upon the original cause of action. The doctrine of collateral estoppel by judgment is applicable. See Restatement of Judgments, Sections 68–71.[2]

---

1. Professor Austin W. Scott, Reporter (with Professor Warren A. Seavey) for the Restatement of Judgments, sets forth the distinction as follows:

   "Within the doctrine of res judicata, it is of vital importance to observe the distinction between the effect of a judgment upon the cause of action on which the judgment is based and its effect upon a subsequent controversy between the parties based upon a different cause of action. A judgment has the effect of putting an end to the cause of action which was the basis of the proceeding in which the judgment is given. * * * ¶Very different is the effect of a judgment upon a subsequent controversy between the parties based upon a different cause of action but involving the same or some of the same questions which was involved in the original action. Here the judgment is conclusive between the parties only as to matters actually litigated and determined in the prior action; it is not conclusive as to matters which might have been but were not actually litigated and determined. The cause of action involved in the sec-

   ond proceeding is not extinguished by the judgment in the prior proceeding by way of bar or merger. But matters actually litigated and determined in the prior action cannot be relitigated in the later action. As to such matters, we have said there is a *collateral estoppel*. The estoppel does not rise from representations made by one of the parties upon which the other party has relied, as in the case of the ordinary estoppel *in pais*. But a party who has once fought out a question in litigation with the other party is precluded from fighting it out again. The term 'collateral' estoppel is intended to emphasize the fact that the causes of action involved in the two proceedings are different, even though the issues or some of them are the same." Scott, Collateral Estoppel by Judgment, 56 Harv. L.Rev. 1, 2 (1942).

2. "Where a question of fact essential to the judgment is actually litigated and determined by a valid and final judgment, the determination is conclusive between the parties in a subsequent action on a different cause of action." Restatement of Judgments, Section 68(1).

■ It, of course, is well settled law that a fact decided in an earlier suit is conclusively established between their parties and their privies, provided it was necessary to the result in the first suit. The Evergreens v. Nunan, 2 Cir., 1944, 141 F.2d 927, 928, 152 A.L.R. 1187.[3] American Jurisprudence, Judgments, Section 371, states the rule:

"It is a fundamental principle of jurisprudence that material facts or questions which were in issue in a former action, and were there admitted or judicially determined, are conclusively settled by a judgment rendered therein, and that such facts or questions become res judicata and may not again be litigated in a subsequent action between the same parties or their privies, regardless of the form the issues may take in the subsequent action, whether the subsequent action involves the same or a different form of proceeding, or whether the second action is upon the same or a different cause of action, subject matter, claim, or demand, as the earlier action. In such cases, it is also immaterial that the two actions are based on different grounds, or tried on different theories, or instituted for different purposes, and seek different relief. * * * "

Similarly, Freeman writes: "Regardless of any differences in the cause of action or subject matter, the conclusiveness of a former adjudication extends to every question in issue and determined by the court * * * though not then directly the point in issue. * * * [A judgment] is conclusive as to all matters within the scope of the pleadings which are material and relevant and were in fact determined." 2 Freeman on Judgments, Section 688, p. 1450.

■ Collateral estoppel carries a built-in danger that it may be applied loosely to subsequent litigation having such a tenuous connection with the original controversy that application of the doctrine would work an injustice. To avoid that danger the Restatement of Judgments, Section 68(O) and 68(p) states that collateral estoppel applies "only where the facts determined are essential to the judgment", that is, "facts in issue" as distinguished from "merely evidentiary facts, even though the determination of the facts in issue is dependent upon the determination of the evidentiary facts". Judge Hand in The Evergreens v. Nunan, limits the doctrine to "ultimate facts" as opposed to "mediate data". Ultimate facts are "those facts, upon whose combined occurrence the law raises the duty, or the right, in question". We would state the limita-

3. The doctrine of collateral estoppel originated with The Dutchess of Kingston's case, 20 How.St.Tr. (Eng.), Smith's Leading Cas. 424, 9th Am.ed. The leading case on the distinction between collateral estoppel, though not referred to as such, and res judicata is Cromwell v. County of Sac, 1877, 94 U.S. 351, 24 L. Ed. 195. There are numerous cases in the courts: Tait v. Western Maryland R. Co., 1933, 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1044; Lawlor v. National Screen Service Corp., 1955, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122; Mercoid Corp. v. Mid-Continental Co., 1944, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; U. S. v. International Building Co., 1953, 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182; C.I.R. v. Sunnen, 1948, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898; Alexander v. C.I.R., 5 Cir., 1955, 224 F.2d 788; American Trust Co. v. Butler, 5 Cir., 1931, 47 F.2d 482; Driggers v. Businessmen's Assurance Co. of America, 1955, 5 Cir., 219 F.2d 292; Peckham v. Family Loan Co., 5 Cir., 1952, 196 F.2d 838. See Millar, The Premises of the Judgment as Res Judicata in Continental and Anglo-American Law, 39 Mich.L.Rev. p. 1 (1940); Millar, The Historical Relations of Estoppel by Record to Res Judicata, 35 Ill.L.Rev. p. 41 (1940); von Moschzisker, Res Judicata, 38 Yale L. J. 299 (1929); Scott Collateral Estoppel by Judgment, 56 Harv.L.Rev. 1, p. 942 (1942); Cleary, Res Judicata Reexamined, 57 Yale L.J. 339 (1948); Collateral Estoppel by Judgment, Comment, 52 Col.L.Rev. 647 (1952); Collateral Estoppel, 20 Geo.Wash.L.Rev. 749 (1952); Developments in the Law of Res Judicata, Comment, 65 Harv.L.Rev. 817, 840 (1952).

tion, and apply it to this case: collateral estoppel by judgment is applicable only when it is evident from the pleadings and record that determination of the fact in question was necessary to the final judgment and it was foreseeable that the fact would be of importance in possible future litigation.[4]

Here, Hyman complains of four frauds or breaches of the fiduciary relationship. These are:

(1) *The Phantom Agreement.* This refers to the group of actions by Regenstein involving the secrecy agreement binding Hyman to assign his inventions to Velsicol. It refers also to Regenstein's efforts in court to compel Hyman to assign the inventions and to enjoin Hyman from producing chlordane and other products invented while he was employed by Velsicol.

(2) *The False Promise.* This refers to a conversation in 1943 between Hyman and Regenstein at a birthday party. Hyman claims that Regenstein fraudulently induced him to continue at Velsicol, on the false representation that his interest would be increased. As a result he continued to assign his patent applications to Velsicol.

(3) *The Freeze-Out.* This refers to the recapitalization of Velsicol. Hyman claims that Regenstein caused Velsicol to be recapitalized in order to reduce Hyman's interest in the corporation.

(4) *The Corporate Cudgel.* This is a shorthand term for the involved argument that Regenstein employed the corporate fiction to defraud Hyman.

The first three of these "frauds" have been litigated, and there is no doubt that their determination was necessary to the judgments rendered in the earlier litigation. The critical issue here is whether Hyman was obligated to assign his patents to Velsicol. That was the basic issue in four of the prior suits, two which reached state supreme courts: the first Illinois suit to compel Hyman to assign the chlordane patents and to restrain him from disclosing to others the secrets of those patents; the first Colorado suit to enjoin Hyman from selling chlordane, in which the court issued an injunction against Hyman and gave damages to Velsicol of $1,500,000. In this second Colorado suit, as an affirmative defense, Hyman pleaded unclean hands based on the False Promise and the Freeze-Out. Determination of the question was of course necessary in order for the court to decide the case. The second Illinois suit was the recapitalization suit. The issue was the Freeze-Out. The court held that the plan was "legal and not unfair", "not fraudulently oppressive"; the court distinguished the case from Lebold v. Inland S.S. Co., 7 Cir., 1936, 82 F.2d 351 where "a motive to get rid of the minority was admitted" and, in effect, there was "legal duress * * * on the part of dominant shareholders". The Corporate Cudgel is discussed in the next section of the opinion.

There is a problem of privity.[5] Four of the five suits were brought by Velsicol

---

4. See discussion of Evergreens rule in Collateral Estoppel by Judgment, Comment, 52 Col.L.Rev. 647, 662 (1952) and in Developments in the Law of Res Judicata, Comment, 65 Harv.L.Rev. 817, 842 (1952).

5. The Restatement of Judgments, Section 84 provides: "A person who is not a party but who controls an action, individually or in cooperation with others, is bound by the adjudications of litigated matters as if he were a party if he has a proprietary or financial interest in the judgment or in the determination of a question of fact or of a question of law with reference to the same subject matter or transaction; if the other party has notice of his participation, the other party is equally bound." 1 Freeman on Judgments, Section 432, p. 939 states: "Persons though not nominal parties may, by active and open participation therein, so connect themselves with litigation in which they are interested that the result is res judicata for or against them. Thus whenever one has an interest in the prosecution or defense of an action, and he, in the advancement or protection of such interest, openly takes substantial control of such prosecution or defense, the judgment, when recovered

and the fifth was against Velsicol. Regenstein was not a party of record in any of these suits, but he directed and controlled Velsicol's litigation through Arvey's and Transo's ownership of 56,000 of the 56,400 shares of Velsicol. Hyman alleged that Regenstein caused Velsicol to institute the first three suits and that he was the alter ego of Arvey and Transo. He testified that Regenstein was the moving force, "the party at interest * * * who would stand to gain most if Velsicol were to prevail". In the first Illinois case and the first Colorado case Hyman averred in his answers that Regenstein controlled and determined the affairs of Velsicol. He brought Regenstein into these cases directly by alleging acts of fraud and misconduct which would have subjected Regenstein to suits for damages—if Hyman had prevailed in the litigation; these same allegations are the basis of the present suit. In the first Colorado suit, he averred, "to all intents and purposes, Regenstein is the plaintiff Velsicol". We consider that Regenstein's participation in the lawsuits, control over Velsicol's part in it, and his proprietary interest in the outcome connect him so closely with the judgments that collateral estoppel applies in his favor against Hyman.[6]

> therein, is conclusive for and against him to the same extent as if he were the nominal as well as the real party to the action."
>
> 6. See Bruszewski v. United States, 3 Cir., 1950, 181 F.2d 419, 422. The Court said: "* * * But where, as in this case, res judicata is invoked against a plaintiff who has twice asserted essentially the same claim against different defendants, courts have, as indicated in the cases above cited, enlarged the area of res judicata beyond any definable categories of privity between the defendants. * * *" Concurring, Judge Goodrich stated: "* * * My view of the law is that a man having had his day in court is collaterally estopped by the judgment rendered in the lawsuit as against his opponent. He is likewise estopped as to persons sufficiently close to that opponent to make it fair to have the estoppel run against them also. This last phrase is, I take it, what is meant by 'privity.' Privity states no reason

## IV.

Regenstein's use of so-called Corporate Cudgel *in all its ramifications* cannot be said to have been an issue decided in the previous litigation. The term embraces the entire theory of the plaintiff's cause of action and is based on the contention that Hyman and Regenstein were engaged in a joint venture. Hyman contends that in 1931 he agreed to supply the brains and Regenstein the money in a joint venture. Regenstein, with diabolical cleverness, clothed the transaction with the corporate "cloak" that he could put on or take off at will. The cloak became a "cudgel". Regenstein, taking advantage of the corporate fiction and his dominant position, used the corporation as "a weapon of litigation" against his co-venturer in violation of the fiduciary relationship inherent in joint venture. By means of this weapon he deprived Hyman of his brain children and his interest in Velsicol stock, and unjustly enriched himself.

■ The sine qua non of joint venture is a contract purposefully entered into by the parties.[7] It is not a status imposed by law but is a relationship voluntarily assumed and arising wholly ex contractu. In Porter v. Cooke, 5 Cir.,

> for including or excluding one from the estoppel of a judgment. It is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the res judicata. * * * *"
>
> 7. "As between the parties, although not necessarily as to third persons, a contract is essential to create the relation of joint adventurers. The sine qua non of the relationship of joint adventure is a contract, express or implied. As a legal concept, a joint adventure is not a status created or imposed by law, but is a relationship voluntarily assumed and arising wholly ex contractu. As in contracts generally, the essence of a joint-adventure contract is that it binds the parties who enter into it, and, when made, obligates them to perform it, and failure of any of them to perform constitutes, in law, a breach of contract. * * * *" 30 Am.Jur., Joint Adventures, Section 7, p. 943.

1942, 127 F.2d 853, 857, a case frequently cited, this Court said:

> " * * * whatever in law a joint adventurer, this case law hybrid of recent origin and undetermined connotation may be, and however difficult to distinguish in particular cases between joint adventures and partnerships, some courts having gone so far as to say that they are subject to the same rules and principles, it is as fundamental to the existence of a joint adventure as it is to the existence of a partnership, that there be a contract between the parties that they are or are to be joint adventurers. As in partnerships, whatever the case as to outsiders, as between the members the relationship of joint adventurers is a matter of intent and arises only where they intend and agree to associate themselves as such. 30 Am.Jur. page 681. It being established here both upon the findings and upon the facts the record discloses, that Cooke never intended to be and never was, either a partner or a joint adventurer with the plaintiffs, the whole theory of recovery based upon the contention that he was, falls to the ground. * * * "

One aspect of the relationship between parties does not determine the existence of a joint venture; the whole scope of the relationship between them must be examined. For example, an agreement to furnish the finances for a scheme or project does not necessarily constitute the transaction a joint venture, even though the profits may be divided. Feagin v. Champion, 1945, 195 Okl. 116, 155 P.2d 518; Preston v. State Industrial Accident Comm., 1944, 174 Or. 553, 149 P.2d 957. The parties must intend that there be a joint proprietary interest and a right of mutual control, there must be an agreement for the sharing of profits, and the actions of the parties must show a cooperative undertaking. Burnet v. Leininger, 1932, 285 U.S. 136, 52 S.Ct. 345, 76 L.Ed. 665;

Henning v. Cox, 5 Cir., 1945, 148 F.2d 586; Kasishke v. Bair, 10 Cir., 1945, 146 F.2d 113; Yerger v. Graham, 1939, 150 Kan. 411, 94 P.2d 317.

The most damaging fact against Hyman's theory is that when he was first sued in Illinois and Colorado he did not defend on the ground that the inventions which were the subjects of the suits belonged to the joint venture, not to the corporation. He did not assert an interest in the inventions as a joint venturer. He asserted sole ownership. Hyman's first claim of a joint venture was in 1949 in an affirmative defense in the answer filed in the second Colorado case. About the same time, he asserted the theory also in a supplemental pleading in the first Colorado case. This was in answer to a supplemental complaint requesting an accounting for operations of Julius Hyman and Company *after* the Colorado Supreme Court had decided in favor of Velsicol. The supplemental pleading was dismissed after Hyman lost the second case and the claim for an additional accounting was settled. The claim of a joint venture set up as a defense in the second suit was lost when the Court decided against Hyman and his associates. They were required to account to Velsicol. In other words, it took Hyman nearly twenty years to discover that he embarked on a joint venture in 1931.

It seems to us that from January, 1931, to September, 1946, Hyman's actions contradicted his claim of joint venture. The conversations in 1931, the contract Hyman admits he signed with Transo, the contract he was held to have signed with Velsicol (which all employees sign), his course of conduct as an officer and employee all show that there was no joint venture clothed with the corporate fiction but an ordinary business use of a corporation with Hyman in the position of an employee. In his Transo agreement, and in the letter to the Salary Stabilization Unit, he stated that he was an employee of Velsicol. In a speech he made before other Velsicol employees shortly before his resignation he spoke

merely as a dissatisfied employee. Hyman's interest was fixed by his pro rata interest in the company's stock issue, and by his salary; he shared in the profits or losses only as a stockholder. In Godwin v. Camp, 7 Cir., 1924, 295 F. 785, 791, a somewhat similar case, the court held that there was no joint venture, chiefly because the designer "was paid as compensation for her services fixed commissions upon the gross sales, without reference to whether the business made a profit or suffered a loss, and thus whether or not there were any net or joint proceeds to divide". We cannot imply a joint venture merely from the cordial relations that previously existed between Hyman and Regenstein, and this is really all that we are left with. See Krause v. Hall, 1928, 195 Wis. 565, 217 N.W. 290.

The trial judge held that the relation of joint venturers never existed. We agree.

### V.

Finally, Hyman contends that even if the term "joint venture" is not the appropriate name for the business relationship that existed, Regenstein stood in a position of trust and confidence toward Hyman in 1931 and since.

The general rule is that a confidential relationship exists between two persons when one has gained the special trust of the other and purports to act or advise with the other's interests in mind. 1 Scott on Trusts, p. 34. The law of Illinois controls this question, since all of the significant activity took place in Illinois. Grand Trunk Western R. Co. v. Chicago & Western Indiana Co., 7 Cir., 1942, 131 F.2d 215. Illinois courts require a strong showing to prove the existence of a confidential relationship. Evans v. Berko, 1951, 408 Ill. 438, 97 N.E.2d 316; Wood v. Armstrong, 1948, 401 Ill. 111, 81 N.E.2d 468; Moneta v. Hoinacki, 1946, 394 Ill. 47, 67 N.E.2d 204, 211. As the court said in the Moneta case:

"Special confidence and trust on one side and domination and influence on the other side must be proved

in order to sustain a finding that a fiduciary relation existed. * * * A fiduciary relationship does not arise out of kinship of the parties alone, and where one seeks to establish such a relationship, the proof must be clear and convincing and so strong as to lead unmistakably to but one conclusion."

We cannot say that kinship and some disparity in age are sufficient to prove a confidential relationship. We do not see that Hyman reposed more trust in Regenstein than is ordinarily found among men in business together. We cannot find that Regenstein dominated Hyman. Hyman did not live alone in an inventor's dream-world; he had complete managerial control at Velsicol and proved to be a good businessman. He was twelve years younger than Regenstein, a disparity in age of scant importance after thirty. In short, we see no special reason to find a confidential relationship.

Appellant sets up the alleged False Promise as one of the four "counts" on which Regenstein is guilty of breaching his fiduciary duty. The argument is not entirely clear, but the False Promise is argued as "the inducing *cause* of such fraud as produces a constructive trust". As such it is related to the contention that Regenstein was in a position of trust and confidence.

We are not impressed—any more than the trial judge—with the appellant's evidence on this point and the conclusions he has drawn. We fail to see how a few minutes' conversation at a party could have induced Hyman to do any more than he was bound to do under his contract with Velsicol. The contract required him to assign patent applications to the company. Regenstein's vague statement to make an adjustment some time in the future created no contract and established no constructive trust. Hyman could hardly have regarded this conversation as constituting any independent agreement with Regenstein; he admitted that he did not mention the

conversation for at least two years after it occurred. In the interim, his salary was increased from $18,200 to $31,200.

It is unnecessary to discuss any of the other contentions. The facts, the law, the equities are against appellant.

Judgment is

Affirmed.