Sam E. BROADHEAD, Plaintiff,

v.

James L. ENOCHS, Director of Internal Revenue, Defendant.

Civ. A. Nos. 724, 723, 675, 684, 679.

United States District Court
S. D. Mississippi, E. D.

Dec. 23, 1959.

O. Winston Cameron and deQuincy V. Sutton, Meridian, Miss., for Mr. Broadhead.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Carrington Williams and Arthur L. Biggins, Attys. U. S. Dept. of Justice, Tax Division, Washington, D. C., for defendant.

CLAYTON, District Judge.

This is a consolidation of five separate complaints filed by plaintiff to recover additional income taxes and penalties assessed for the years 1940, 1941, 1942, 1944, and 1945. Payment of these assessments was made June 26, 1952, and the complaints seek interest from the date of payment. At the time these assessments were made, the statute of limitations had been extended by written consent from plaintiff for the year 1941 only. For the other four years, the validity of the assessments depends entirely upon proof of fraud. Internal Revenue Code of 1939, § 276(a), 26 United States Code Annotated (now § 6501(c), Internal Revenue Code of 1954, 26 U.S.C.A. § 6501(c)). The burden of proving fraud is defendant's, which is conceded. This burden is "to prove affirmatively by clear and convincing evidence actual and intentional wrongdoing on the part of the petitioner with a specific intent to evade the tax". Carter v. Campbell, 5 Cir., 1959, 264 F.2d 930, 936. In addition to this heavy burden, defendant is met here by other obstacles of no small moment and these must be precisely stated so that the boundaries of this inquiry may be clearly seen. Defendant concedes that plaintiff's return for 1939 was not tainted with fraud. Civil Action No. 722 in this court was a complaint seeking recovery of additional income tax assessed and paid for the year 1943, the fraud penalty thereon and interest from date of payment. That cause was tried by Judge Mize and he found that there was no fraud on the part of plaintiff for that year. See Broadhead v. Enochs, D.C., 162 F.Supp. 897. From that action of this court, de-

fendant did not appeal. Many of the issues tendered in the trial of that case which were necessarily dealt with by the court in reaching its decision, are also issues in these cases now before the court. Hence, defendant is estopped with respect to those matters which were in issue in the 1943 case, Civil Action No. 722, upon the determination of which the findings there were rendered. United States v. International Building Co., 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182; Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898; Tait v. Western Maryland Railway Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405; Hyman v. Regenstein, 5 Cir., 1958, 258 F.2d 502; Campbell v. Batman, 5 Cir., 1956, 239 F.2d 283; Alexander v. Commissioner of Internal Revenue, 5 Cir., 1955, 224 F.2d 788; Montgomery v. Thomas, 5 Cir., 1944, 146 F.2d 76; Bennett v. Commissioner of Internal Revenue, 5 Cir., 1940, 113 F.2d 837, 130 A.L.R. 369; Donald v. J. J. White Lumber Co., 5 Cir., 1934, 68 F.2d 441. Moreover, the income tax liability of plaintiff for the year 1946 was litigated before the Tax Court in its docket number 49,777, Sam E. Broadhead v. Commissioner, 14 TCM 1284, affirmed 5 Cir., 1958, 254 F.2d 169, and that court held there was no fraud with respect to the return for plaintiff for 1946. To summarize: There was no fraud in 1939; there was no fraud in 1943; there was no fraud in 1946; and by application of the doctrine of collateral estoppel by judgment, this court must accept the findings of Judge Mize, on all issues necessary to his decision in Civil Action No. 722, which are applicable here. However, if fraud is shown, then plaintiff has the burden of showing that the additional tax assessed is erroneous, and what proper tax should have been reported and paid before he is entitled to any recovery here. Venio v. Fahs, 5 Cir., 1958, 257 F.2d 364; Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623; United States v. Harris, 5 Cir., 1954, 216 F.2d 690; United States v. Pfister, 8 Cir., 1953, 205 F.2d 538; Taylor v. Commissioner, 2 Cir., 1934, 70 F.2d 619; Roybark v. United States, D.C.S.D.Cal., 104 F.Supp. 759, affirmed 9 Cir., 1954, 218 F.2d 164.

1) The additional tax, penalty, and interest paid, as here involved, is shown in Table I [1], while the determination of additional income, upon which the assessments of additional tax were based, is shown at Table II [2]. The hearing for

1.                               Table I.

| Year | Tax | Penalty | Interest | Total Paid |
|------|-----|---------|----------|------------|
| 1940 | $ 3,242.98 | $ 1,621.49 | $ 2,194.91 | $ 7,059.38 |
| 1941 | 7,203.85 | 3,601.92 | 4,443.63 | 15,249.40 |
| 1942 | 47,991.01 | 23,995.50 | 26,635.01 | 98,621.52 |
| 1944 | 45,402.27 | 22,701.14 | 19,749.99 | 87,853.40 |
| 1945 | 64,301.29 | 32,150.54 | 24,397.74 | 120,849.37 |
| Total | $168,141.20 | $84,070.59 | $77,421.28 | $329,633.07 |

2.                               Table II.

| Year | Income Reported | Income Determined | Difference Unreported |
|------|-----------------|-------------------|-----------------------|
| 1940 | $ 2,935.18 | $ 24,828.65 | $ 21,893.47 |
| 1941 | 9,120.71 | 29,147.28 | 20,026.57 |
| 1942 | (7,011.56) | 82,097.44 | 89,109.00 |
| 1944 | (11,307.70) | 74,800.32 * | 86,108.02 |
| 1945 | 7,571.90 | 97,760.08 | 90,188.18 |
| Total | $ 1,308.53 | $308,633.77 | $307,325.24 |

* The original determination of net income for 1944 was $80,520.32. This was corrected by the allowance of depletion for that year in the amount of $2,220 and an allowance of $3,500 as transfers or loans deposited.

these consolidated cases consumed the greater part of three weeks. In addition to the evidence introduced at this hearing for the first time, many of the exhibits which were introduced on the trial of Civil Action No. 722, aforementioned, were reintroduced. Moreover, under stipulation and in accordance with the direction of Judge Mize, in that case, all of the evidence presented to him should be considered as evidence in this case. Hence, the record before this court is quite voluminous. Any attempt to recite this evidence in detail would be time consuming, tedious, and perhaps confusing. Therefore, only its essence as necessary to an understanding of this court's conclusions will be dealt with here. And, since the question of fraud affects such a large part of the controversy here, that question will be considered first.

2) Sam E. Broadhead, the plaintiff, has a sixth grade public school education, and was a farmer and common laborer in Alabama before coming to Mississippi. He had been "following an edger" for five cents per hour immediately before coming to this state, and when he arrived here, he had less than two weeks pay and one gray mule. Shortly after coming to Mississippi, he bought one old truck on credit and began logging for a lumber mill. A few months later, he bought another second hand truck on credit in order to enlarge his logging operation, which was then in Clarke County, Mississippi. Later he acquired additional used trucks and some work mules and horses. He first commenced lumber operations for himself at Carmichael, Mississippi, a rural community in Clarke County, about forty miles Southeast of Meridian, Mississippi. Nearest banking facilities were in Quitman, also in Clarke County. In about 1938, Broadhead moved to Brewer, another small rural community, without banking or postal facilities, but located several miles closer to Quitman. He lived and operated in Brewer until the summer of 1945, when he moved to Meridian. In 1939, he borrowed money from a lumber company and bought about 3,000 acres of timber land for $5,160, giving a deed of trust on the land and lumber which might be produced therefrom. He bought three other small timber tracts at Brewer for about $1,300 cash in 1939, and filed his first income tax return for that calendar year.

3) During the several years here involved, plaintiff had the office help of only one person. She began work as a store clerk, then began to work as a billing clerk, and later undertook whatever routine bookkeeping that was done in the simple system used for both the lumber business and the commissary connected therewith. This consisted of entering and preserving purchase and sale invoices, bank statements, deposit slips, and cancelled checks, mill reports, and books containing lumber and merchandise sales registers, purchase journal, and check register. Plaintiff obviously knows nothing of office records or of bookkeeping or accounting, and, unfortunately, the one clerical helper mentioned was untrained.

4) In 1939 plaintiff employed a reputable certified public accountant who installed a simple bookkeeping system for him that year and prepared plaintiff's 1939 income tax return. This same accountant also prepared plaintiff's income tax returns for the years 1944, 1945, and 1946. A skilled bookkeeper, who had been head bookkeeper for a large lumber concern with an office at Quitman, prepared plaintiff's income tax return for 1942 and 1943. This bookkeeper died in about 1944. All these returns were signed by plaintiff with the exception of that for 1942. This was signed by the said bookkeeper, but was not signed by Broadhead. All returns were signed by the accountants (bookkeeper) and Broadhead testified that he did not know why he did not sign the 1942 return personally, that it was his return and he so intended it, and would have signed it without question.

5) During all of the years here in question, it is apparent that plaintiff relied upon said experienced bookkeeper

and said certified public accountant in making and filing his income tax returns. And, that he signed and filed these returns without question and without attempting to understand them. It is doubtful that he examined carefully any of these returns and it is clear that he had little, if any, real conception of the proper way to keep business records or to return income tax.

6) Plaintiff is a shrewd buyer of property connected with the lumber business, but relied principally on four other people to sell his manufactured product and to collect the proceeds of such sales. At the banks where he did business during these years, plaintiff was extended liberal credit. In his business dealings, other than routine operation of his lumber business, he relied on his bankers, lawyers, and accountants for guidance. Substantially all of his dealings were in the lumber business and most of his operations were channelled through his bank accounts, particularly in 1944 and 1945. When he undertook an oil drilling enterprise in 1945, he suffered a substantial loss and withdrew therefrom in a very short time.

7) Investigations were begun in 1946 for the years 1940, 1941, and 1942. The scope of the investigations was later enlarged to include the years 1943, 1944, and 1945. It also appears that the 1939 return of plaintiff was called out, but that no question was ever raised with respect thereto. Stemming from these investigations were other investigations affecting the years 1946 and 1947, with which we are not here concerned. A Special Agent was assigned to this project as his first investigation after joining the Intelligence Unit of the Treasury Department. In addition to the investigation made by the Special Agent, there was an investigation made by a Revenue Agent. These investigations were extensive, detailed and thorough. Basically, two well known methods were used by these investigating agents since they considered plaintiff's books and records to be inadequate. They were the bank deposits plus cash expenditures method and the net worth method. The principal result of these investigations, with which we are here concerned, was a determination by the Commissioner of Internal Revenue of additional amounts of unreported taxable income, for each of the years involved, and the assessment of additional taxes, fraud penalties, and interest as heretofore shown. For its case of fraud, defendant relies principally on what is claimed to be plaintiff's consistent failure to report substantial amounts of income over the years with which we are concerned, but he also relies on other circumstantial evidence claimed to indicate fraudulent intent with respect to income tax on the part of plaintiff. Dealing first with the two differing versions of income as reflected by plaintiff's returns and the determinations based on these investigations, it is apparent that some of the principal differences arise with respect to inventory, depletion (or stumpage), and depreciation. There are other differences which are proper for consideration on the question of fraud, although some of these differences may be in method rather than in fact.

8) Lumber inventories, in the aggregate, for the years involved present the largest area of controversy. Inventory was not considered in preparing plaintiff's tax returns, but the determination upon which these additional assessments were based, included an opening lumber inventory on January 1, 1940, of $25,-665, and showed substantial increases each year. The proof offered by defendant of the existence of inventory was a letter signed by plaintiff addressed to the Special Agent under date of May 14, 1947, listing lumber inventories at the end of each year in question. The "spread back" of lumber inventories mentioned in this letter grew out of an audit report made for plaintiff by his aforementioned certified public accountant in connection with a project by plaintiff to seek a large bank loan. The audit report was made as of August 31, 1946, and the portion thereof dealing with lumber inventory was based upon a physical count

of lumber, made by a recognized lumber grader and inspector, showing that plaintiff, at said date, had an inventory of some nine million board feet of lumber. The question of lumber inventory was one of the principal issues presented to this court and decided by Judge Mize in the aforementioned Civil Action No. 722. In that case [162 F.Supp. 902], Judge Mize found "that said letter did not reflect fact and was in no way connected with the said original return made by Plaintiff for the year 1943, said letter being written at the special instance and request of defendant, to 'spread back' a lumber inventory of Plaintiff determined to be present in the middle part of 1946; and that Plaintiff did not understand the purpose or possible consequence of said letter, signing the letter as a step in negotiating and straightening out the difference between Defendant and Plaintiff. * * * " Judge Mize further said, referring to this letter, "this was due to an understanding between the agents and the accountant of the Plaintiff, but at which time the Plaintiff was not present, that there would be a spread back of inventory from the year 1946 through a period of several years in order to allocate the tax over a period of years rather than to have a large tax with the damage and penalties for one year." * * * Hence, this letter, and the inclusion of inventory in plaintiff's taxable income, for the years in question here, as a result of this letter, have no value as evidence on the issue of fraud. Plaintiff consistently insisted that he had no inventory or inconsequential inventory at the beginning and end of each year with which we are now concerned. Plaintiff did testify that he may have had on hand a lumber inventory of from 150,000 to 400,000 board feet of lumber on December 31, 1945, but, it is not necessary, on the issue of fraud, for this court to find anything further with respect to lumber inventories.

9) The determination, upon which these additional assessments were based, allowed as a deduction, in lieu of depreciation, payments made by plaintiff for automotive equipment purchased. To this there was added amounts allowed as depreciation on other depreciable property. In the aforementioned trial of Civil Action No. 722, this court found that the added amount allowed as depreciation, was based solely upon a memorandum dated April 3, 1947, of a certified public accountant, who, in that particular, gratuitously undertook to represent plaintiff without any authority so to do, and that the depreciation figures therein listed for the years here involved did not represent any determination by the Commissioner of Internal Revenue that the depreciation claimed by plaintiff in his several returns was erroneous or excessive. The evidence in this trial shows that such depreciation amounts allowed were similarly derived. The evidence further shows, because of the nature of plaintiff's business, and the effect thereof upon the items of depreciable property involved, that the depreciation claimed by plaintiff was reasonable in each of the years here involved. This is particularly true in view of the fact that the depreciable property used by plaintiff was largely used or old machinery when acquired by him. The average useful life of such property was four to five years as to mills and machinery, but only about fourteen months as to automotive equipment and logging tractors. The arbitrary allowance on the determination precludes its consideration as proof of fraud. At most, it was a difference of opinion which is not "clear and convincing evidence (of) taxpayer's actual and intentional wrong doing with a specific intent to evade the tax", as required by Carter.

10) In his lumber operations, plaintiff undertook to accumulate land acreage, and by the end of 1945, he had approximately 33,000 acres of land, most of which had cost between $1.50 and $3.50 per acre. Most of this was sold after the years here involved. As he was acquiring timber land, plaintiff undertook to pay for it with the timber he cut from it. These payments, as determined by

defendant, compared with "stumpage" claimed as deductions in plaintiff's return and also compared with "stumpage" and depletion allowed by defendant are as shown in Table III [3].

11) In arriving at the determination upon which the additional assessments were based, under the bank deposits plus cash expenditures method as used, certain paid checks of plaintiff were classified as expended for personal uses and were thus not allowable as deductions. An arbitrary estimate of additional personal living expenses was also added to plaintiff's net taxable income. In fact, these two items, as dealt with in the determination, seem inconsistent and with respect to the issue of fraud, should not be considered as a part of income.

12) When these principal areas of difference are considered in the light as discussed herein, they all have a significant bearing on the issue of fraud. This may be demonstrated by an approximate statement of "economic income" or actual cash or cash equivalent earnings shown available to plaintiff on the face of his returns. On his figures, there was available to him $166,921.90. See Table IV [4].

And, it is also helpful to note that, on the figures used in these determinations, a total of $247,779.87 was in the area of estimates and assumptions. See Table V [5]. Estimates and assumptions are not

3.

Table III

| Year | Payments on land per defendant | Stumpage deducted in returns | Stumpage and depletion used by defendant |
|------|--------------------------------|------------------------------|------------------------------------------|
| 1940 | $20,918.00 | $41,201.91 | $11,837.25 |
| 1941 | 28,274.00 | 7,728.00 | 10,960.00 |
| 1942 | 28,660.91 | 31,254.30 | 14,086.76 |
| 1944 | 1,300.00 | 0.00 * | 6,354.00 |
| 1945 | 710.00 | 10,214.32 | 44,968.79 |
| | $79,862.91 | $90,398.53 | $88,206.80 |

\* No stumpage appears in the return as an identifiable separate item.

4.

Table IV

| Year | Net Income Returned | Add: Allowances deducted in returns | | | Total (Economic Income) |
| | | Stumpage | Depreciation | Bad Debts | |
|------|---------------------|----------|--------------|-----------|-------------------------|
| 1940 | $2,935.18 | $41,201.91 | § 8,959.86 | 0.0 | $ 53,096.95 |
| 1941 | 9,120.71 | 7,728.00 | 8,827.64 | 0.0 | 25,676.39 |
| 1942 | (7,011.56) | 31,254.30 | 8,758.30 | 0.0 | 33,001.04 |
| 1944 | (11,307.70) | 0.0 | 9,602.22 | $23,104.14 | 21,398.66 |
| 1945 | 7,571.90 | 10,214.32 | 15,962.64 | 0.0 | 33,748.86 |
| | $1,308.53 | $90,398.53 | $52,110.70 | $23,104.14 | $166,921.90 |

( ) Indicates loss.

5.

Table V

| Year | Net Income Determined | Inventory Gains | Living Expense | Stumpage | Depreciation Amts. | Total |
|------|-----------------------|-----------------|----------------|----------|--------------------|-------|
| 1940 | $ 24,828.65 | $ 10,215.00 | $ 2,000.00 | $11,837.25 | $ 4,742.69 | $ 28,794.94 |
| 1941 | 29,147.28 | 13,145.00 | 2,500.00 | 10,960.00 | 4,889.74 | 31,494.74 |
| 1942 | 82,097.44 | 20,695.00 | 2,500.00 | 14,086.76 | 8,330.22 | 45,611.98 |
| 1944 | 74,800.32 | 35,770.00 | 2,500.00 | 6,354.00 | 10,723.54 | 55,343.54 |
| 1945 | 97,760.08 | 27,705.00 | 3,000.00 | 44,968.79 | 10,860.88 | 86,534.67 |
| | $308,633.77 | $107,530.00 | $12,500.00 | $88,206.81 | $39,547.07 | $247,779.87 |

the "clear and convincing evidence (of) taxpayers' actual and intentional wrong doing with a specific intent to evade the tax ".[6]

13) Considering the issue of fraud from a different viewpoint, the determination of plaintiff's net worth in 1940 was $23,043.19 compared with an ending net worth as determined for 1945 of $360,420.97, an apparent increase of $337,377.78 for the entire six year period. Eliminating $44,153.74 allocated in the determination as increase in net worth for 1943, there is left a claimed increase, for the five years here involved, of $293,224.04. But, eliminating the aggregate amount of lumber inventory increase allocated to these five years, there remains a figure of $185,944 which is pertinent. Included in this figure, however, is $19,475 as the depreciated cost of an oil rig claimed by defendant to be on hand at the end of 1945. It was stipulated in the trial of the 1946 Tax Court proceedings between these parties that this equipment was not owned by plaintiff during the year 1946. Thus, he could not have owned the oil rig at the end of 1945. Additionally, the evidence here discloses that this rig was sold by plaintiff before the end of 1945. The final corrected amount of apparent net worth increase, as claimed by defendant, is $166,469, which closely approximates the "economic income" of plaintiff shown on the face of his returns for these years, that is, actual income before deductions for depreciation, depletion (or stumpage), and bad debts. See Table IV[4].

14) Additionally, in the claimed opening net worth of plaintiff, at the beginning of these years, January 1, 1940, of $23,043.19, automotive equipment was not considered. There was on hand at that time such equipment at a cost of $9,745.73. Consistent with the method employed, a deduction for the cost of this equipment when paid, the cost of the equipment on hand at the beginning of the period, for which no depreciation deduction was claimed on plaintiff's 1939 return, should be recognized as such a deduction. And the ending net worth statement in the determination used as a basis for the additional assessments at issue here, at the end of 1945, erroneously failed to include accounts payable and outstanding checks of plaintiff in the amount of $14,430.07 incurred by plaintiff in the oil rig project heretofore mentioned. The total of these last two amounts is $24,175.81, which must be eliminated, upon the fraud issue here presented, from the net worth increase as determined.

15) Plaintiff purchased from Dixie Planing Mill, Incorporated, a number of timber contracts and approximately 30 trucks, 5 small sawmills, and other logging equipment for $49,500, but subject to contract rights of persons operating said mills to buy such equipment. This entire sum was erroneously included in the determination as accounts receivable by plaintiff in the net worth figure determined for the end of 1945. The evidence shows that approximately $42,000 of this amount was purchase price paid for the trucks and logging equipment, and at least that amount should be excluded from the closing net worth figure as determined for 1945.

16) In plaintiff's return for 1944, there was claimed as a bad debt de-

---

4. See Note 4 on page 882.

6. To illustrate the validity of the "economic income" statement and its value in determining whether an estimate of personal living expenses added to determined income has much evidential effect where an issue of fraud is involved: A taxpayer's return shows gross income of $20,000 with a deduction (among others) of $5,000 for depreciation. Taxable income is shown at $1,200. Taxpayer would have, on the face of such a return, at least $6,200 available in money for the payment of personal living expense. Hence, addition of an estimate for personal living expense, as evidence tending to show fraud, would seem to have little value.

duction an account owed to plaintiff by Earl D. Love in the amount of $23,104.14. This was an actual valid debt which arose in 1943, as part of a series of transactions with Love, and plaintiff failed to collect the amount so due. It became worthless in 1944, and was properly deducted in the 1944 return of plaintiff. None of the evidence shows that this bad debt was given any consideration in making the determinations in question here. Specific allowance of this item would not be consistent with the bank deposits method employed, but, on the issue of fraud, it has some value when considered with respect to the parallel net worth method used.

17) In addition to the determination used as a basis for the assessments here in question, defendant sought to establish plaintiff's net worth for the year 1945 independently by the testimony of an accountant with respect to balance sheets prepared by him for plaintiff, in connection with the preparation of plaintiff's income tax return for the year 1946. These two balance sheets as of December 31, 1946, differed by $54,872.81, and defendant relied upon the larger figure of $523,175. These two balance sheets differ in one particular only. One showed an account payable of $40,393.62 and no account receivable from the same company. The other balance sheet shows an account receivable from this company in the amount of $14,479.19, but no account payable to that company. The difference between such account payable amount and such account receivable amount, for the same company, on the same date, thus is $54,872.81, the natural result of transforming an account payable into an account receivable. Both of said balance sheets reflect an opening inventory of $189,000 in 1946. Thus, this balance sheet net worth figure must be adjusted by eliminating therefrom the beginning lumber inventory of $189,000 for reasons previously stated, and by eliminating the so-called "accounts" of sawmill operators arising from the aforementioned Dixie Planing Mill transaction. Elimination of these errors will reduce the effect of this independent proof to a figure in line with the previous findings shown by this opinion when proper consideration is given to depletion (stumpage), depreciation and bad debts in the light aforementioned.

18) Initially defendant contended that plaintiff received and had not accounted for large sums of currency during these years in question, but this aspect of defendant's case, on the issue of fraud, is not urged in the brief submitted following the close of the hearing. Substantially all of the cash shown to have come into plaintiff's hands in the form of currency is accounted for and most of it through regular bank transactions. In 1944 and 1945, plaintiff made a number of lumber sales to C. E. Hood Lumber Company. These total about $40,000 in 1944 and approximately the same amount in 1945. Unsatisfactory credit experience with Hood and information received concerning Hood's checks caused plaintiff to insist upon being paid in cash rather than by check. In 1944, this money went into plaintiff's regular bank accounts. In 1945, after plaintiff sold substantially all of his stock of lumber at Brewer, prior to moving to Meridian, with most of the sales being made to C. E. Hood, plaintiff took the cash from such sales, together with some checks from other sales, and deposited a total of $51,390.98 in the Citizens National Bank in Meridian in the name of Virdie Cox, plaintiff's wife. Deposits to this account were made twice, one in May and one in June of 1945. Plaintiff testified that this money was ear-marked by him to finance his move to Meridian from Brewer so that he could buy a place of business and a home. About two months later, after plaintiff had selected his home and arranged for the purchase of a mill, this account was closed by transferring it to plaintiff's regular business account at the First National Bank in Meridian. Plaintiff was the only person having authority to sign checks on this account, and after it was put in his name, he drew on this account for the purchase of his

home in Meridian and his first business there. And, in 1945, plaintiff negotiated for and purchased a planing mill and dry kiln installation of Stallworth-Phillips Lumber Company, arranging as a part of these negotiations to buy the inventory of lumber of this company for Earl D. Love. The tentative price set for the inventory was $16,400, subject to actual inventory count of such lumber. The mill and kiln was purchased for a total of $20,000. The lumber inventory was finally determined to cost $15,907.58, so the total price paid to Stallworth-Phillips Lumber Company in this transaction was $35,907.58. Love delivered to plaintiff the sum of $14,500 in currency for which plaintiff gave him a receipt. When it appeared that this amount would be insufficient to buy the lumber inventory, Earl D. Love delivered to plaintiff an additional $1,500, on condition that Love would have free use of the planing mill and dry kiln long enough to ship out the lumber inventory. The $16,000 in cash was paid to Stallworth-Phillips Lumber Company, and the balance of the purchase price was paid by plaintiff out of his regular business banking account at the First National Bank in Meridian. Plaintiff purchased his home in Meridian for $20,328 and paid for it by checks drawn on his said regular business banking account at the same bank. There was no apparent effort at concealment of these transactions and plaintiff was accompanied by his regular attorney for the property purchases and his regular bank completed the mill purchase for him.

19) The bank deposits plus cash expenditures method of audit is an expedient, of value only when available books and records are inadequate. It does not yield the same results as any recognized standard of bookkeeping or method of accounting based on adequate books and records, although it probably more nearly approximates the cash system of record keeping and tax reporting than any other. It does not approximate nor parallel the accrual system of record keeping, which was the system used by plaintiff. In many areas, this audit method will yield

results of significant difference from those which would be reflected by an accrual system of bookkeeping and tax reporting. In at least one noticeable instance, there was such a significant difference in this case. The determination was that plaintiff's total gross income for the year 1942 was $225,764.84, while the return reported his total gross income at $172,685.76, or $53,079.08 less than determined under the aforesaid audit method. However, plaintiff's return for 1941 showed gross income of approximately $63,160.10 more than was determined by this audit method used, after correction for substantial errors in this determination. Hence, apparently, the method shifted gross income from 1941 to 1942. Included as gross income for 1942 were the collections made in that year from sales which were made in 1941, and reported by plaintiff, on his accrual method, as income in 1941, although not collected in 1941; this was done without an accompanying shift in deductions. The determination showed gross income for the two years, 1941 and 1942, together, to be $400,065.55, but it seems that this amount should be no more than $337,905.45, after correction for apparent errors totaling approximately $63,-160.10. This amount is about equal the 1942 net income changes of $65,485.92 made by the investigating agents, other than those from estimates of inventory increase, living expense, depreciation and personal checks. With these corrections, it is obvious that plaintiff reported more gross income for the two years, together, than was found, with an accurate application of the method of audit used, for the same two years.

20) This audit method used has its greatest value when it is accomplished accurately, and applied consistently, especially for a period of several years, such as we have in this case. Numerous errors were made in its application in this case. For example, a deposit item in the amount of $7,638.43, deposited to plaintiff, as treated by the Special Agent, resulted in an increase in net income of at least that amount, although it was re-

imbursement for money paid by plaintiff for J. S. Stein for a one-half interest in an oil royalty when none of the expenditure by plaintiff was deducted. And, there was included as income to plaintiff an item of $1,322.91 which was derived exclusively from a statement submitted by Wogan-Wilson Lumber Company to plaintiff in December of 1941 on a statement entitled "Balance Due Us". This should have been classified as an account payable by plaintiff. Additionally, a number of items were erroneously classified as capital amounts when, in fact, under the audit method used, they should have been classified as deductions. Some of these are as follows: $57,085.54 in timber cutting contracts purchased by plaintiff from Dixie Planing Mills, Incorporated, in 1945, and, in the same year, deductible amounts of $1,223 for automotive equipment purchased by plaintiff from Dixie Motor Sales; $6,500 in automotive and logging equipment purchased by plaintiff from Frank Miller; $3,500 in automotive and logging equipment purchased by plaintiff from Dock Downey and $5,225 in logging equipment purchased by plaintiff from J. A. Anderson and his wife. Consistency required that all of these be deducted as expense items. There were also numerous land or timber deed transactions wherein plaintiff paid the purchase price therefor by checks, which were not identified by the Special Agent properly as expenditures for land and timber deed purchases, but the purchases were shown as having been made by cash which was not considered as going through the bank account of plaintiff. In fact, the method, as applied in this area, resulted in increasing determinations of taxable income erroneously. It would be burdensome and would lengthen needlessly this opinion to undertake to set out these transactions in greater detail.

21) An effort to impeach the credibility of plaintiff as a witness was made by defendant who brought the following out on trial, principally through exhibits introduced over objections by the plaintiff. Plaintiff was indicted for evasion of income tax for some of the years here at issue, including the year 1943, and entered a plea of nole contendere to the indictment. Judge Mize considered this plea on the trial of the aforementioned Civil Action No. 722, saying that it was to be considered * * * "but has very little weight" * * *. [162 F.Supp. 902.] That finding would appear to be binding here, and in addition, it has been almost uniformly held that such a plea is a mere statement of unwillingness to contest and it is not receivable in another proceeding as evidence of guilt and it has only a very limited value in certain restricted areas for impeachment. Mickler v. Fahs, 5 Cir., 1957, 243 F.2d 515. Plaintiff was indicted on a charge of violating the OPA ceiling price in the sale of a 1942 truck by selling such truck for $1,000, whereas the ceiling price thereon was $800, and was fined in the amount of $230. A permanent injunction was issued by this court against plaintiff in April of 1941 enjoining violations of the provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. and he was afterward cited for contempt for violation of the injunction and fined. A claim for additional taxes, penalty and interest was made against plaintiff by the Tax Commission of the State of Mississippi for some of these years. To comply with the requirements of this court in the matter of minimum wages, plaintiff paid his employees by check. Some of these checks were paid through plaintiff's regular bank account, but many of them were paid, according to plaintiff, by him, in cash, with the checks being used as receipts when endorsed by the payees. Some of these latter checks were bank stamped, although not cleared through the bank account. Plaintiff testified that many of these checks were cashed by him as an accommodation to his employees, since there were no banking facilities available to these employees where work for plaintiff was being done. Cash withdrawals from his regular bank accounts were sufficient during this period to cover most, if not

all, of these checks. Defendant also cross-examined plaintiff concerning a suit between plaintiff and a man by the name of Kennedy wherein a partnership accounting between the parties thereto was concerned, but covering years after the period here involved. Most of these extraneous matters are in the record with ruling reserved and objections timely made by plaintiff. Many of them are of doubtful admissibility and none of them are sufficient to change the judgment of this court formed with respect to the value of plaintiff's testimony in this case. Ample opportunity to observe him, hear him and pass upon his credibility as a witness was afforded during the trial, and as a witness, he made a good impression, when his limited education and the background of his early years are considered.

22) Considering all of the evidence and all of the circumstances disclosed by this record, it seems clear to this court that defendant has failed, for any of the five years with which we are concerned, to meet the burden of proving by clear and convincing evidence any actual and intentional wrong doing on the part of plaintiff with a specific intent to evade the tax. Carter v. Campbell, supra.

23) Turning now to the additional assessment for the year 1941. which is not dependent upon a finding of fraud for its validity, this court is met with a problem quite different from that heretofore discussed with respect to the issue of fraud. To overcome this additional assessment, when the fraud aspects are laid aside, plaintiff has a twofold burden (1) to show that the additional assessment is erroneous and, also, (2) *to show the correct amount of tax which should have been returned and paid.* Helvering v. Taylor, supra; Decker v. Korth, 10 Cir., 1955, 219 F.2d 732, certiorari denied, 350 U.S. 830, 76 S.Ct. 61, 100 L.Ed. 740; United States v. Harris, supra; United States v. Pfister, supra; Taylor v. Commissioner, supra; Roybark v. United States, supra. Plaintiff may have met the first burden. His return reported his net taxable income for 1941 as $9,121.71, while the determination of his net taxable income for that year, resulting from the aforesaid investigations, was $29,147.28. Thus, there was a difference between return and determination of $20,026.67. A substantial part of this difference is composed of estimated lumber inventory (derived from the aforementioned letter which does not "reflect fact") and estimated living expense, made, as it appears, ex parte by the agents conducting the investigations. Other parts of the determination are highly questionable. But, conceding that plaintiff has shown the determination for this year to be erroneous, he did not attempt to show that his return was correct and the evidence does not, with any degree of accuracy, show the correct amount of tax which should have been returned and paid. Hence, except for the imposition of the fraud penalty, the additional assessment for 1941 must stand.

24) In accord with the foregoing, the following findings of fact are made:

a) Defendant failed to meet the burden of showing by "clear and convincing evidence" that plaintiff filed fraudulent returns for any of the years involved here (1940, 1941, 1942, 1944, and 1945) "with a specific intent" to evade payment of income tax, as is required by Carter.

b) Plaintiff failed to meet the burden of showing the correct amount of income tax which should have been returned and paid for the year 1941.

25) It necessarily follows as a conclusion of law, that plaintiff is entitled to the relief prayed for in Civil Actions numbered 724 (1940), 675 (1942), 684 (1944), and 679 (1945), and, to the extent of the fraud penalty only, in Civil Action No. 723 (1941), but, he is not entitled to any relief with respect to the additional tax assessed and paid for the year 1941.

Orders may be prepared in accordance with this opinion.