430 F.2d 38
 DIPLOMAT ELECTRIC, INC., a Florida corporation, Plaintiff-Appellee,
v.
WESTINGHOUSE ELECTRIC SUPPLY COMPANY, a division of Westinghouse Electric Corporation, a Pennsylvania corporation, Defendant-Appellant.
 No. 27818.
 United States Court of Appeals, Fifth Circuit.
 July 29, 1970.
 
 COPYRIGHT MATERIAL OMITTED Scott, McCarty, Steel, Hector & Davis, Dwight Sullivan, Miami, Fla., for appellant.
 Morris C. Tucker, Pompano Beach, Fla., Joseph A. McGowan and Alan R. Schwartz, Miami, Fla., for appellee; Horton & Schwartz, Miami, Fla., and Miller, Tucker, Roth & Prominski, Pompano Beach, Fla., of counsel.
 Before PHILLIPS,* BELL and SIMPSON, Circuit Judges.
 ORIE L. PHILLIPS, Circuit Judge:
 
 
 1
 Diplomat Electric, Inc.,[1] brought this action against Westinghouse Electric Supply Company,[2] to recover damages for injury to Diplomat's credit and business reputation by one libel and two slanders alleged to have been committed by Paul E. Yurtinus, Credit Manager of Westinghouse at its Miami and Fort Lauderdale branches, acting as the agent of Westinghouse.
 
 
 2
 Diplomat was an electrical contracting company, with headquarters in Fort Lauderdale, Florida. It began business in 1959. It specialized in doing the electrical installations, including the furnishing of the labor and materials, on large projects, under a subcontract with the general contractor. By 1963, its annual gross sales had risen to in excess of $800,000. It was managed by its president, John P. Potter.
 
 
 3
 It was stipulated in a pre-trial stipulation by the parties that Fred Howland, Inc., was the general contractor on the Pier 66 job, a building at Fort Lauderdale, Florida; that Apgar & Markham Construction Company, Inc., was the general contractor on the Miami Springs High School job; that James Thompson, Inc., was the general contractor on the Hallandale Junior High School job; that Wesley Construction Company was the general contractor on the Florida Power & Light Executive Office Building job in Miami, Florida; that Diplomat was the electrical subcontractor on each of such jobs; and that Diplomat contracted with Westinghouse to furnish the electrical equipment, materials, and supplies for each of such jobs.
 
 
 4
 Phillips Petroleum Company was the owner of the Pier 66 Building.
 
 
 5
 It was further stipulated that at all times here material, Yurtinus was the Credit Manager of Westinghouse at both its Miami and Fort Lauderdale branches.
 
 
 6
 At all times here material, until January 14, 1965, James M. Kelley was Sales Manager of Westinghouse at its Fort Lauderdale branch. He was the sales manager through whom Diplomat dealt in contracting for the electrical equipment, materials, and supplies to carry out the subcontracts herein involved. Kelley had full authority to contract in behalf of Westinghouse with Diplomat, with respect to the electrical equipment, materials, and supplies Diplomat ordered from Westinghouse through Kelley.
 
 
 7
 In February or March 1962, Diplomat was awarded the subcontract by the general contractor, Fred Howland, Inc., to furnish and install the electrical equipment in the Federal Office Building in Miami, Florida. Westinghouse contracted with Diplomat, through Kelley, to furnish electrical equipment, materials, and supplies to perform such subcontract. Diplomat's work on that subcontract extended over two years.
 
 
 8
 In the late summer of 1964, Yurtinus asked Ross Apgar of Apgar & Markham, the general contractor on the Miami Springs High School job, under which Diplomat was the electrical subcontractor, "Why it didn't do work with some good subcontractors instead of like Diplomat." In the same conversation with Apgar, Yurtinus also said he "thought Diplomat was going broke."
 
 
 9
 On that job, Westinghouse had failed to make deliveries until long after the time fixed in the delivery schedules; and had failed to make delivery of a $10,000 piece of vital equipment, which prevented Diplomat from completing its work on such job, and Potter had declined to pay for it.
 
 
 10
 Westinghouse had failed to furnish the electrical equipment, materials, and supplies it had agreed to furnish for substantial periods after they were due to be furnished, under the delivery schedules on each of such jobs. That was particularly true of the Miami Federal Office Building job. Its failures resulted in substantial losses to Diplomat.
 
 
 11
 Because of such delays, Potter became exasperated and refused to do any further business with Westinghouse. In an attempt to placate Potter and secure for Westinghouse the contract to furnish the electrical equipment, materials, and supplies for the Pier 66 job, on which Diplomat had just started work under a subcontract, Kelley, Yurtinus, Charles Butsch, a Westinghouse factory representative, and one Meier, a branch manager of the district in which Miami and Fort Lauderdale were located, met with Potter in July of 1964. Potter had asserted a claim of $80,000 for losses Diplomat had suffered by reason of Westinghouse's delays in furnishing the electrical equipment, materials, and supplies on the Federal Office Building job, and its failure to furnish at all some of the fabricated equipment on such job. Potter told Westinghouse's representatives that he would not do any further business with Westinghouse until that claim was settled. An agreement was reached, by which Westinghouse was to credit $30,700 on the $80,000 claim on electrical equipment, materials, and supplies thereafter furnished by it to Diplomat, and was to release any claim it might have against Diplomat under the Miller Act on the Federal Office Building job, and Diplomat was to accept $30,700 in settlement of its $80,000 claim, and to enter into a contract with Westinghouse to purchase the electrical equipment, materials, and supplies for the Pier 66 job.
 
 
 12
 After the agreement related above was reached, Diplomat entered into a contract with Westinghouse for the furnishing of the electrical equipment, materials, and supplies for the Pier 66 job; and Westinghouse, by Kelley, executed and delivered to Diplomat a release of any Westinghouse claim under the Miller Act on the Federal Office Building job, which was then practically completed, in order to enable Diplomat to collect the balance due from the contractor on that job.
 
 
 13
 Notwithstanding its promise to the contrary, Westinghouse continued to be guilty of costly delays on the Pier 66 job. Kelley tried to mollify Potter, and entered into a contract to pay Diplomat liquidated damages for any delays occurring after December 31, 1964.
 
 
 14
 Notwithstanding that on December 4, 1964, Westinghouse had released its lien rights on the Miami Springs High School job to Diplomat, Yurtinus sent a letter to Apgar & Markham, to Fidelity & Deposit Company of Maryland, the surety on the general contractor's bond, and to the Dade County School Board on January 19, 1965, purporting to retain the lien and stating the amounts Diplomat owed Westinghouse on the Miami Springs High School job.
 
 
 15
 Both Potter and Kelley testified that on October 28, 1964, Diplomat gave to Westinghouse a check for $5,000, to be applied on the Pier 66 job. Kelley received the check and passed it on to Yurtinus, who forwarded it to Westinghouse. Westinghouse credited the check on the Federal Office Building job. Yurtinus claimed the $5,000 check was paid on the Federal Office Building job, and apparently unknown to Kelley, in November 1964, Yurtinus ordered the fabrication of materials for Diplomat on the Pier 66 job stopped. On January 5, 1965, Yurtinus wrote a letter to Diplomat, sent copies to the owner, to J. M. Lloyd, the project manager, and to Fred Howland, Inc., the general contractor on the Pier 66 job, stating that Diplomat had been delinquent in the amount of $4,985.23, due to Westinghouse on such job since the previous August; that Diplomat had failed to keep several of its commitments, and that Westinghouse had advised Diplomat by telephone and letters on September 10, 1964, October 2, 1964, and November 17, 1964, that Westinghouse had stopped fabrication and would not make any further deliveries until such balance of $4,985.23 had been paid.
 
 
 16
 The libel claim was predicated on the statement of Yurtinus to the owner, the project manager, and the general contractor on the Pier 66 job that Diplomat had been delinquent in the amount of $4,985.23 since August 1964.
 
 
 17
 Yurtinus had failed to check the purchase order or to confer with Kelley before sending that letter. Kelley, at Potter's request, sent the general contractor a telegram, stating the letter was erroneous. In response to an inquiry by the general contractor as to whether such telegram refuted or rescinded the letter of January 5, 1965, Yurtinus, without checking with Kelley, replied that it did not.
 
 
 18
 Also in January 1965, without having examined the purchase order on the Florida Power & Light Company Office Building job, which purchase order set forth the terms of payment, Yurtinus told a representative of the Florida Power & Light Company that there was $102,000 past due from Diplomat to Westinghouse on that job. Under the purchase order, payment was due "EOM plus 60 days." Yurtinus testified that the terms were "2 percent at the end of the month, if I remember, plus 60 more days." Hence, shipments made in a particular month were not due for payment until the end of such month, plus 60 days. Therefore, payment for shipments made in November and December, 1964, was not due until February 1, 1965, or thereafter. Yurtinus tried to justify his statement by saying "bills are usually paid on the 10th of the month," but finally admitted that the $102,000 was not due when he made the statement that it was past due, and that his statement was false. One of the slander claims was based on the statement that $102,000 was past due on the Florida Power & Light Company job.
 
 
 19
 In July 1964, Yurtinus told James Thompson, the general contractor on the Hallandale Junior High School job, the amount due and unpaid on that job from Diplomat to Westinghouse. The amount which he stated was substantially in excess of the amount actually due. Later, Thompson called Yurtinus and questioned the correctness of the amount he had stated. Yurtinus made an investigation and thereafter advised Thompson that the amount given was erroneous and occurred because Westinghouse had mistakenly billed Diplomat for a dimmer switch which was not ordered by or delivered to Diplomat. The other slander claim was based on Yurtinus's false statement to Thompson as to the amount due from Diplomat to Westinghouse on the Hallandale Junior High School job.
 
 
 20
 As a direct result of the defamations, particularly the January 5, 1965, libel, Diplomat's business collapsed to nothing. Its bank-loan standing and the preeminently important ability to secure bonding for the performance of its contracts, which had been excellent before the incidents, totally disintegrated and Diplomat became insolvent.
 
 
 21
 Had the $5,000 check been credited to the Pier 66 job, as directed by Diplomat, it would have discharged all indebtedness due from Diplomat to Westinghouse on that job, up to October 31, 1964.
 
 
 22
 On October 28, 1964, the $5,000 check was delivered to Kelley, and he, acting for Westinghouse, signed and delivered to Diplomat a release of its lien rights on the Pier 66 job property, up to October 31, 1964.
 
 
 23
 Such release stated that Westinghouse "in consideration of partial payment" of $5,000, "receipt" of which "is hereby acknowledged," does "hereby waive, release and quitclaim all liens [and] lien rights," which it "now has, or may hereafter have, against * * * certain real estate and the improvements thereon, * * *."
 
 
 24
 It set forth the legal description of such real estate, which was the real estate on which the building known as Pier 66 was then being erected.
 
 
 25
 It provided that the release should apply only to materials furnished and work done up to October 31, 1964. It was dated October 28, 1964.
 
 
 26
 In its answer in the instant case, Westinghouse set up as defenses, based on estoppel by judgment, adjudications in two former actions. One was an action brought in a Florida Circuit Court by Westinghouse against Diplomat in 1966 to recover an alleged balance due it from Diplomat for materials sold and delivered to it by Westinghouse for use in the Federal Office Building. It will hereinafter be referred to as Former Action No. 1. The other was an action brought in the United States District Court for the Southern District of Florida by Westinghouse against Diplomat in 1966 to recover an alleged balance due it from Diplomat for materials sold and delivered to it by Westinghouse for use in the Florida Power & Light Company Building. It will be referred to hereinafter as Former Action No. 2.
 
 
 27
 In its complaint in Former Action No. 1, Westinghouse alleged, in addition to the jurisdictional facts, only the following:
 
 
 28
 "COUNT I
 
 
 29
 "Defendant (Diplomat) owes Plaintiff (Westinghouse) $25,832.39 for materials sold and delivered by Plaintiff to Defendant between October 9, 1963 and June 6, 1964.
 
 
 30
 "COUNT II
 
 
 31
 "Defendant owes Plaintiff the sum of $25,832.39 according to the account attached hereto as Exhibit `A'."
 
 
 32
 Exhibit A is not a monthly statement. It reflects charges from October 9, 1963, to June 6, 1964, and two credits, one on June 19, 1964, for $7.54 and one on November 3, 1964, for $5,000. It reflects the $5,000 credit that is in dispute in the instant action, as follows:
 
 
 33
 "11:03:6:39 145399:CS: 5,000 CR:"
 
 
 34
 The credit is not otherwise described.
 
 
 35
 Westinghouse did not allege that it rendered regular monthly statements of the Federal Building account to Diplomat, or that Diplomat did not object thereto and promise to pay Westinghouse the amount shown thereon to be due Westinghouse. It did not otherwise allege any facts that would support a finding of an account stated and it did not allege that Diplomat paid it $5,000 on the Federal Office Building account, except by inference from the $5,000 credit entry on Exhibit A.
 
 
 36
 Hence, there was no issue presented by the pleadings with respect to an account stated, and Diplomat in its answer alleged that it did not owe the amount set forth in Exhibit A to Westinghouse.
 
 
 37
 Former Action No. 1 was consolidated with a prior action brought against Westinghouse by Diplomat, in which Diplomat sought to recover damages for the alleged failure of Westinghouse to deliver materials for the Pier 66 job, for an alleged overcharge, and for the $30,700 Westinghouse had agreed to pay Diplomat in settlement of the latter's claim on the Federal Building job.
 
 
 38
 In July 1967, the trial judge entered an order directing Diplomat to produce certain documents. Diplomat failed to obey that order and a default was entered against it as a sanction.
 
 
 39
 Thereafter, Diplomat was notified that the case would come on for trial on September 26, 1967. Diplomat failed to appear, and of course offered no evidence.
 
 
 40
 In Former Action No. 1, the trial court found that:
 
 
 41
 "WESTINGHOUSE * * * rendered regular monthly statements to DIPLOMAT * * * for the balance due and owing on the account for materials sold for use and incorporation in the Federal Office Building job, to which DIPLOMAT * * * did not object and which DIPLOMAT agreed to pay";
 
 
 42
 that:
 
 
 43
 "The last date that WESTINGHOUSE * * * sold materials to DIPLOMAT * * * on the Federal Office Building job was June 1, 1964, at which time there was a balance due of $30,832.39";
 
 
 44
 that:
 
 
 45
 "On November 3, 1964, DIPLOMAT * * * paid to WESTINGHOUSE * * * $5,000.00 on account of the statement rendered by WESTINGHOUSE to DIPLOMAT for materials sold for incorporation in the Federal Office Building job."
 
 
 46
 The court concluded that it had jurisdiction of the subject matter of the action. As to the merits, it made only the two following conclusions:
 
 
 47
 "The failure of DIPLOMAT * * to object to the statements rendered by WESTINGHOUSE * * * their part payment made on November 3, 1964, and their promise to pay the balance of the account, renders the account between the parties and account stated. * * *"
 
 
 48
 "Plaintiff, WESTINGHOUSE * * is entitled to a judgment in its favor against DIPLOMAT * * * in the sum of $25,832.29, plus interest from June 1, 1964 and costs."
 
 
 49
 The court awarded judgment in favor of Westinghouse against Diplomat for $25,832.39, plus interest from June 1, 1964, and for costs.
 
 
 50
 It is clear that the judgment was predicated on the theory of an account stated. Counsel for Westinghouse so concede in their reply brief.
 
 
 51
 In its complaint in Former Action No. 2, Westinghouse alleged in paragraphs 6 and 7 that Wesley Construction Company was the "prime contractor" and Diplomat the electrical contractor for construction of the Florida Power & Light Company Building; that between January 13, 1964, and December 31, 1964, Westinghouse furnished and delivered to Diplomat the "electrical materials" to carry out its subcontract, and in paragraph 7 of its complaint, Westinghouse alleged that "DIPLOMAT has failed and neglected to pay to" Westinghouse "the sum of $102,866.19, for said materials furnished by" Westinghouse "in the prosecution of the work provided for in said contract and subcontract."
 
 
 52
 In its answer to the complaint, Diplomat denied the allegations in paragraphs 6 and 7.
 
 
 53
 Westinghouse did not allege in such complaint when, under the terms of its contract with Diplomat, the $102.866.19 became due, and while it prayed generally for interest, it did not pray for interest from any specified date. There was no issue under the pleadings as to when interest was to begin to run.
 
 
 54
 In Former Action No. 2, the court ordered and adjudged as follows:
 
 
 55
 "Plaintiff, WESTINGHOUSE * * do have of and recover from the defendant, DIPLOMAT * * * the sum of $102,681.26, plus interest thereon at the rate of 6% per annum, from December 31, 1964, in the amount of $15,630.36, * * *."
 
 
 56
 Westinghouse contends that the award of interest on $102,681.26 from December 31, 1964, was an adjudication that such amount became due on that date. It is a more reasonable conclusion that the award of interest from December 31, 1964, was based on the fact the last of the materials was delivered by Westinghouse on that date and not on the date the $102,866.19 became due.
 
 
 57
 Estoppel by judgment, sometimes referred to as "collateral estoppel,"[3] operates to prevent the relitigation of issues theretofore actually adjudicated between the same parties in a former action on a different cause of action.[4]
 
 
 58
 Its operation is limited to matters distinctly put in issue, litigated, and determined in the former action.[5]
 
 
 59
 The adjudication must have been necessary to the result in the former action.[6]
 
 
 60
 If the court, in the former action, assumes to adjudicate an issue or question not submitted by the parties in their pleadings nor drawn into controversy by them in the course of the evidence, and bases its judgment on such adjudication, the judgment is not conclusive in a subsequent proceeding, under the doctrine of estoppel by judgment.[7]
 
 
 61
 We have shown above that in Former Action No. 1 there was no issue on the question submitted by the parties on their pleadings nor drawn into controversy by them in the course of the evidence with respect to an account stated. The pleadings show that Westinghouse did not in anywise plead an account stated nor facts in support of an account stated, and since Diplomat defaulted and did not appear at the trial and offer evidence, an issue with respect to an account stated was not drawn into controversy in the course of the evidence.
 
 
 62
 The credit entry on Exhibit A to the complaint in Former Action No. 1, at most, justifies an inference that Westinghouse received $5,000 from Diplomat and credited it on the Federal Building account. There is no dispute in the instant case that Westinghouse gave credit to Diplomat of $5,000 on November 3, 1964, on the Federal Office Building account, but that is not the issue in the instant case. The real issue is whether Diplomat, when it made the $5,000 payment to Westinghouse on November 3, 1964, directed Westinghouse to credit the $5,000 on the Pier 66 job account. That such direction was, in fact, given was clearly shown by the evidence of Potter and Kelley, and was strongly corroborated by the fact that Kelley, acting on behalf of Westinghouse, executed and delivered to Diplomat on October 28, 1964, a release of Westinghouse's lien for materials furnished for the Pier 66 job, up to October 31, 1964.
 
 
 63
 Here, a separate contract was entered into between Diplomat and Westinghouse, under which Westinghouse was to furnish Diplomat with electrical materials for each of the jobs above mentioned; and Westinghouse kept a separate account of the charges made against Diplomat for the materials furnished it and the credits allowed it on such account, on each of such jobs. It is a well settled principle that a debtor who owes more than one debt or indebtedness due on separate accounts to a creditor and makes a payment to a creditor, may, at the time he makes such payment, direct to which debt or account the payment shall be credited, and the creditor is bound to apply such payment as directed by the debtor.[8]
 
 
 64
 The law of Florida is in accordance with that general principle.[9]
 
 
 65
 Since the question of whether Diplomat, at the time it made the payment of $5,000 on October 28, 1964, directed Westinghouse to credit the payment on the Pier 66 job account was not in issue in Former Action No. 1, and since, for the reasons above set out, the adjudication of an account stated was not conclusive on Diplomat in the instant case, we hold that Diplomat was not precluded by the judgment in Former Action No. 1 from proving that it paid $5,000 on October 28, 1964, to Westinghouse, and directed at the time of the payment that it should be credited on the Pier 66 account.
 
 
 66
 Westinghouse bases its claim of estoppel by judgment in Former Action No. 2 solely on the fact that the court in its judgment awarded interest from December 31, 1964, on the sum of $102,681.26. It asserts that such allowance of interest from December 21, 1964, was an adjudication that such amount became due on that date.
 
 
 67
 There was no allegation in the complaint as to when such amount became due, nor was there any issue raised by the pleadings as to when it became due. Westinghouse's contention is based solely on an inference drawn from the date from which interest was allowed. It appears from Exhibit A, attached to the complaint in Former Action No. 2, that the last of the materials were delivered on December 31, 1964, and it is a much more reasonable inference that the court awarded interest from the date the last of the materials were delivered than from the date the indebtedness became due. The most that can be said is that Westinghouse's contention presented an issue of fact for the jury, which resolved the issue against Westinghouse, under proper instructions by the court.
 
 
 68
 Westinghouse contends that in addition to the bar of estoppel by judgment by Former Actions No. 1 and No. 2, the alleged libel by the letter of January 5, 1965, written by Yurtinus, and the alleged slander by the statement of Yurtinus to the representative of Florida Power & Light Company that there was $102,000, plus, past due from Diplomat to Westinghouse on its job were qualified privileged communications.
 
 
 69
 Counsel for Westinghouse also asserted that the alleged slander by the statement of Yurtinus to Thompson as to the amount due Westinghouse on the Hallandale Junior High School job was a qualified privileged communication.
 
 
 70
 Good faith is an essential prerequisite to a qualified privilege.[10]
 
 
 71
 Where a person has published a false statement and information thereafter comes to him from a reliable source which would put a reasonable person on inquiry as to the truth of such statement, and instead of making such inquiry he wilfully republishes the false statement, the repetition of the defamation is strong evidence of malice.[11]
 
 
 72
 The statement made by Yurtinus to Ross Apgar in the summer of 1964, "Why it didn't do work with some good subcontractors, instead of like Diplomat," and that he "thought Diplomat was going broke," which preceded both the alleged libel and the slanderous statement to the representative of the Florida Power & Light Company, showed plainly that Yurtinus had developed a strong animus toward Diplomat as far back as the summer of 1964.
 
 
 73
 After Kelley by telegram had advised Fred Howland, Inc., that the letter of Yurtinus, dated January 5, 1965, was not correct, and that fact was made known to Yurtinus and he was asked if Kelley's telegram refuted or rescinded his letter of January 5, 1965, Yurtinus, instead of making inquiry as to the truth of his letter, immediately republished the false statement in such letter to a representative of Fred Howland, Inc. That was likewise strong evidence of malice.
 
 
 74
 We conclude that the questions as to whether the defamations were made in good faith and without malice, at most, presented questions of fact for the jury. The trial judge, under proper instructions, submitted those issues to the jury and it resolved them adversely to Westinghouse.
 
 
 75
 This case was before the court on a former appeal by Diplomat from a summary judgment in favor of Westinghouse, which judgment this court reversed. Diplomat Electric, Inc. v. Westinghouse Electric Supply Co., 378 F.2d 377. On that appeal, this court held that the alleged libelous letter, if false, was libelous per se, and that the two alleged slanderous statements, if false, were slanderous per se, and it was not necessary for Diplomat to allege or prove malice or special damages.[12] See 378 F. 2d at 384, 385.
 
 
 76
 In the opinion on the former appeal, the court said:
 
 
 77
 A "corporation has the right to maintain an action for libel or slander when a publication assails its management or credit and inflicts injury on its business. `The authorities fully sustain the conclusion', the court said in Maytag Co. v. Meadows Mfg. Co., 7 Cir., 1930, 45 F.2d 299, 302, `that where a libel contains an imputation upon a corporation in respect to its business, its ability to do business, and its methods of doing business, the same becomes libelous per se, and that special damages need not be alleged. The management and credit of a corporation and its solvency are all most carefully guarded by the law, and imputations against the same, imputing lack of credit, insolvency, or pecuniary difficulties are rightfully deemed of such injurious character as to be actionable per se without allegations of special damage. The legal principles constituting the law of libel and slander are the same whether corporations or individuals are involved.' "Thus, in such a case the law presumes that some damage will flow in the course of things from the mere invasion of plaintiff's rights and calls it general damage, which need not be proved by evidence, and in such a case there is no necessity that the plaintiff show special damage." (See 378 F.2d at 382, 383.)
 
 
 78
 In the opinion on the former appeal, this court also said:
 
 
 79
 "* * * It is well settled in Florida, as elsewhere, that a corporation, just as an individual, may be liable for defamation by its employees. It is equally well settled that the credit, property or business reputation of a corporation can be injured by a false publication of defamatory matter, written or oral, which tends to prejudice it in the conduct of its trade or business, or to deter third persons from dealing with it. Since a corporation has no reputation in the sense that an individual has, it is only with respect to its credit, property or business that a corporation can be injured by a false publication. * * *." (See 378 F.2d at 381.)
 
 
 80
 Here, Diplomat sought to obtain for its pecuniary loss only general damages. It neither pleaded nor sought to prove loss of future profits or other special damages.[13]
 
 
 81
 The decisions of law made by this court on the former appeal, the case having been remanded for a trial on the merits, under the doctrine of "law of the case" were controlling on the trial court and are controlling on this court on this appeal, except as to a legal decision, which this court on reexamination determines to be clearly erroneous.[14]
 
 
 82
 At the trial, Diplomat's books of account for the years 1960 to 1964, inclusive, were introduced in evidence.
 
 
 83
 Diplomat's witness, McCall, was a C.P.A. and Diplomat's accountant. Basing his testimony on Diplomat's books and records, he stated that on a cash receipts basis, its cash receipts for the year 1960 were $122,765; 1961 — $291,216; 1962 — $258,272; 1963 — $822,914; and 1964 — $819,521; he further stated that on an accrual basis for 1963 they were $912,145, and for 1964, $824,529. He further stated that the salaries paid its officers in 1960 were $3,902; in 1961 — $10,693; in 1962 — $13,400; in 1963 — $25,891; and in 1964 — $15,600. And he further stated that the retained earnings for 1963 were $71,812, and for 1964, $13,340.
 
 
 84
 Reinhold P. Wolff, a consulting economist, whose qualifications were not in anywise challenged, testified that on the basis of the building permits in Dade and Broward Counties, Florida, he estimated the gross earnings of electrical contractors in those counties for the years 1960 to 1968, inclusive, would be approximately $798,000,000.
 
 
 85
 On the basis of the testimony of Mr. McCall and the experience of electrical contractors in Dade and Broward Counties, Florida, being the counties in which Diplomat engaged in the electrical contracting business, he estimated the amount Diplomat's gross receipts would have been for the years 1964 to 1968, inclusive, had there been no defamations by Westinghouse. Such estimates were: $932,600 in Diplomat's fiscal 1965; $903,709 in its fiscal 1966; $1,000,000 in its fiscal 1967, and $1,458,400 in its fiscal 1968.
 
 
 86
 Using what he said was a conservative profit ratio of 4.5 per cent of gross receipts, he estimated that Diplomat would have had business earnings of $41,967 in fiscal 1965; $40,667 in fiscal 1966; $46,642 in fiscal 1967; $65,628 in fiscal 1968; $65,628 in fiscal 1969; $35,064 in fiscal 1970; $21,874 in fiscal 1971, and $14,556 in fiscal 1972.
 
 
 87
 Diplomat began the business of furnishing and installing electrical equipment on large construction projects at the beginning of the year 1960. Its business enjoyed a substantial growth from the years 1960 to 1964. In the year 1960, its gross sales were $122,765. In the year 1963, they were $822,914 and in the year 1964, they were $819,521. However, in 1964, Diplomat had begun to suffer the effects of the publication of the slanderous statement sued on, made in the middle of July, 1964.
 
 
 88
 Prior to the publication of the libel and the two slanderous statements for which Diplomat sought only general damages from Westinghouse, its credit was good, it was able to obtain ample bank loans to meet its needs, to purchase on the usual credit terms electrical equipment, supplies, and materials, and to obtain without difficulty construction contract bonds.
 
 
 89
 Prior to such publications, it also enjoyed a good reputation as an installer of electrical equipment.
 
 
 90
 As a result of the publication of the two slanderous statements and the libelous statement, Diplomat's reputation as an installer of electrical equipment, its ability to obtain construction contract bonds, its excellent credit rating, and its ability to obtain bank financing and to purchase electrical equipment and materials on the usual credit terms were destroyed, and in the vernacular used by Potter in his testimony, it "went broke." Hence, the general damages suffered were the value of Diplomat as a going concern, before the publication of the libel and the slanderous statements.
 
 
 91
 We are of the opinion that the testimony of McCall and Wolff was properly admitted, not as proof of loss of future profits, which was not submitted to the jury, but as an aid to the jury in arriving at the amount of general damages Diplomat was entitled to recover for the destruction of its business, which was the only pecuniary damage issue submitted to the jury.
 
 
 92
 The evidence of the publication by Yurtinus of the other slanderous statements was received for the purpose of showing lack of good faith and malice on the part of Yurtinus, and under the instructions of the court was submitted to the jury only for those purposes.[15]
 
 
 93
 Accordingly, we affirm.
 
 
 
 Notes:
 
 
 *
 Of the Tenth Circuit, sitting by designation
 
 
 [1]
 Hereinafter referred to as Diplomat
 
 
 [2]
 Hereinafter referred to as Westinghouse
 
 
 [3]
 United States v. Burch, 5 Cir., 294 F.2d 1, 5
 
 
 [4]
 United States v. Burch, supra, at 5; Hyman v. Regenstein, 5 Cir., 258 F.2d 502, 510; Tomlinson v. Lefkowitz, 5 Cir., 334 F.2d 262, 264; See also, Kelliher v. Stone & Webster, 5 Cir., 75 F.2d 331, 333, citing De Sollar v. Hanscome, 158 U.S. 216, 221, 15 S.Ct. 816, 39 L.Ed. 956
 
 
 [5]
 Chandler v. Chandler, Fla.App.1969, 226 So.2d 697, 699; Wacaster v. Wacaster, Fla.App.1969, 220 So.2d 914, 916; Kelliher v. Stone & Webster, supra, at 333
 
 
 [6]
 Wacaster v. Wacaster, Fla.App.1969, 220 So.2d 914, 916; Tomlinson v. Lefkowitz, 5 Cir., 334 F.2d 262, 264; Hyman v. Regenstein, 5 Cir., 258 F.2d 502, 510, 511
 
 
 [7]
 Barnes v. Cady, 6 Cir., 232 F. 318, 323; 50 C.J.S. Judgments § 732, p. 223
 
 
 [8]
 40 Am.Jur., Payment § 110, p. 792; 70 C.J.S. Payment § 52, pp. 257-259
 
 
 [9]
 Merker v. Lake Region Packing Ass'n., Fla., 126 Fla. 589, 172 So. 702, 704; Alford v. Leonard, 88 Fla. 532, 102 So. 885, 889; Battle v. Jennings Naval Stores Co., 74 Fla. 12, 75 So. 949, 952; Burton Swartz Land Corp. v. Commissioner of Int. Rev., 5 Cir., 198 F.2d 558, 561
 
 
 [10]
 Morgan v. Dun & Bradstreet, Inc., 5 Cir. (Fla.), 421 F.2d 1241, 1242; O'Neal v. Tribune Company, Fla.App.1965, 176 So.2d 535, 542
 
 
 [11]
 Morgan v. Dun & Bradstreet, Inc., 5 Cir. (Fla.), 421 F.2d 1241, 1242, 1243; Mays v. Stratton, Fla.App.1966, 183 So. 2d 43, 44, cert. denied, Fla., 188 So.2d 817
 
 
 [12]
 See also: Tip Top Grocery Co. v. Wellner, 135 Fla. 518, 186 So. 219, 221
 
 
 [13]
 Diplomat also prayed for punitive damages, which the jury denied
 
 
 [14]
 Atchison, T. & S. F. Ry. Co. v. Ballard, 5 Cir., 108 F.2d 768, 772; American Surety Co. of New York v. Bankers' Savings & Loan Ass'n., 8 Cir., 67 F.2d 803, 805-806
 
 
 [15]
 Ross v. Esquire, Inc., 2 Cir., 94 F.2d 75, 77; Merriman v. Lewis, 141 Fla. 832, 194 So. 349